AMERICAN SATELLITE COMPANY,
Plaintiff–Appellant,

v.

The UNITED STATES, Defendant–
Appellee.

No. 92–5136.

United States Court of Appeals,
Federal Circuit.

July 7, 1993.

Rehearing Denied; Suggestion for
Rehearing In Banc Declined
Oct. 27, 1993.

Caryl A. Potter, III, Sonnenschein, Nath & Rosenthal, Washington, DC, argued, for plaintiff-appellant.

Terrence S. Hartman, Dept. of Justice, Washington, DC, argued, for defendant-appellee. Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Allen D. Bruns, Asst. Director, Commercial Litigation Branch, Dept. of Justice, Washington, DC, were on the brief, for defendant-appellee. Also on the brief were June W. Edwards, Associate Gen. Counsel and William J. Bierbower, Sr. Atty., National Aeronautics and Space Admin., of counsel.

Before RICH, MAYER and LOURIE, Circuit Judges.

MAYER, Circuit Judge.

American Satellite Company (ASC) appeals the judgment of the United States Court of Federal Claims,[1] 26 Cl.Ct. 146

---

1. The United States Claims Court was renamed the Court of Federal Claims on October 29, 1992.

(1992), which held it could not recover damages under its August 3, 1984, contract with the National Aeronautics and Space Administration (NASA) where NASA's failure to launch ASC's spacecraft was the result of a change in United States space policy announced by the President. ASC also appeals the Court of Federal Claims' judgment that the government did not breach a second Agreement, executed December 6, 1988, because ASC failed to obtain appropriate government clearances authorizing NASA to reclassify ASC's spacecraft as a priority payload. We reverse in-part, vacate in-part and remand.

*Background*

ASC and NASA executed a Launch Services Agreement (LSA) on August 3, 1984, pursuant to which NASA agreed to use its "best efforts" to launch two ASC satellites through its Space Shuttle program. In all relevant parts, this Agreement was identical to one executed between Hughes Communication, Inc., and NASA on December 5, 1985, which is the subject of our opinion in *Hughes Communications, Inc. v. United States,* 998 F.2d 953 (Fed.Cir.1993), issued today. Pursuant to the LSA, NASA launched ASC's first spacecraft (ASC–1) on August 27, 1985. At the time of the space shuttle Challenger explosion on January 28, 1986, ASC's second spacecraft, ASC–2, was scheduled for launch on January 27, 1987. Initially, NASA informed ASC that it was endeavouring to establish a new manifest which would accommodate commercial payloads in essentially the same priority as the previous manifest. On June 3, 1986, NASA informed ASC that ASC–2 had been assigned a new launch date in December 1989. However, on August 15, 1986, the President announced that NASA would no longer be in the business of launching commercial payloads. *See id.,* at 956.

On September 25, 1986, the President issued a memorandum to NASA which directed that only commercial payloads which were "Shuttle Unique" or had "National Security and Foreign Policy" implications would be launched. *Id.* Like Hughes' spacecraft, ASC–2 was not included in either of these categories and was not included on the new shuttle manifest. Accordingly, on October 30, 1986, NASA informed ASC by letter of the new manifest and stated that "it appears almost certain you will not be provided launch services either prior to or after your current contract expires in September 1995." NASA also reminded ASC of its termination rights under the contract, pursuant to which it could receive a refund of its progress payments made up to that date. Instead of exercising its right to terminate, ASC informed NASA that it considered its actions to be a "breach and final repudiation" of the LSA. NASA returned ASC's progress payments under an Agreement that neither party was terminating the LSA.

On December 6, 1988, NASA and ASC executed a new document entitled "Agreement." The first paragraph of this Agreement provided: "Contel ASC will attempt to obtain by January 31, 1989, any governmental clearances, certifications, or determinations necessary to authorize a Shuttle launch of ASC–2. If by January 31, 1989, NASA is not authorized to provide a Shuttle launch for ASC–2, this Agreement will terminate." [2] Paragraph 2 of the Agreement provided that if "NASA is authorized to provide a Shuttle launch for ASC–2," NASA would within 30 days provide ASC with a new proposed launch date for ASC–2. Agreement, ¶ 2.a. In addition, ASC would have 30 days within which to respond to NASA's "offer." Agreement, ¶ 2.b. If ASC responded favorably, NASA and ASC were to enter into negotiations for the launch of ASC–2 pursuant to the original LSA. Agreement, ¶ 2.b.(1). However, if ASC rejected the proposed launch date, the Agreement would terminate. Agreement, ¶ 2.b.(2). Finally, paragraph 3 of the Agreement provided: "This Agreement and the actions of NASA and Contel ASC pursuant hereto shall not be deemed to affect, modify, or waive any claims of Contel ASC arising under LSA 1306–002, or otherwise, nor to affect, modify, or waive any of NASA's

Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902(a), 106 Stat. 4506 (1992).

**2.** Subsequent to executing the LSA, ASC began doing business under the name "Contel ASC."

defenses to such claims, except as may be agreed to as set forth in paragraph 2.b.(1)."

ASC undertook the task of obtaining ·appropriate government authorization by contacting Lieutenant General John T. Myers, the Director of the Defense Communications Agency. General Myers wrote a memorandum to Gordon A. Smith, the Assistant Secretary of Defense, Office of Command, Control, Communications and Intelligence, stating that ASC–2 would be the "only readily available domestic satellite" possessing certain encryption technology necessary for national security policy directives relating· to government communications. Smith sent a letter to NASA on January 26, 1989, stating that he had "determined that the services to be provided by the ASC–2 satellite have national security implications. Therefore, NASA is authorized to process the ASC–2 satellite as involving national security interest when manifesting space shuttle payloads."

However, a NASA official wrote Smith on ·February 21, 1989, stating that two other Department of Defense (DOD) officials had informed him that the matter of ASC–2's classification was still under review by the DOD. The official explained that NASA could not change the priority determination until NASA was sure that the DOD was making a final recommendation which represented an agency-wide determination. Finally, the Under Secretary of Defense wrote to the Acting NASA Administrator on June 22, 1989. After summarizing NASA and DOD communications up to that point, the Under Secretary stated:

> On behalf of the Secretary of Defense, I would like to affirm the DOD interest in the ASC–2, based upon the planned 'use of leased circuits and on this satellite's compliance with national policy concerning the protection of its command and control links. However, this should not be construed as DOD sponsoring a modification of the existing National Space Policy, or a reversal of the previous Presidential decision on the provision of launch services by NASA for commercial payloads that re-

moved the ASC–2 from the Shuttle manifest.

NASA did not add ASC–2 to the Shuttle manifest.

ASC then filed suit in the Claims Court, setting out four counts in its complaint. Count I was dismissed for failure to state a claim. Count II alleged that NASA breached the LSA. Count III alleged that NASA breached the December 6, 1988, Agreement by not adding ASC–2 to the shuttle manifest. And Count IV alleged that the President's new space policy constituted a Fifth Amendment violation because ASC's contract rights under the LSA had been taken.

Both ASC and NASA filed motions for summary judgment, and the Claims Court granted NASA's motion. On Count II, the Claims Court held, as it did in *Hughes,* 26 Cl.Ct. 123,. that the President's new space policy constituted a valid sovereign act. Because it determined the LSA incorporated the sovereign act doctrine by its terms, the Claims Court concluded that the contract had been modified to include the new space policy. On Count III, the Claims Court held that NASA did not breach the December 6, 1988, Agreement, because NASA did not receive the authorization required by the Agreement to trigger its obligation to place ASC–2 on the new manifest. Finally, the Claims Court rejected Count IV, concluding that ASC had no "investment-backed expectation" that the United States' space policy would not change. ASC now appeals only the judgment as to Counts II and III.

### Discussion

■ We reverse and remand the Claims ·Court's judgment on Count II of ASC's complaint on the basis of our opinion in *Hughes.·* There, we held that Article IV of the LSA, which obligated NASA to "provide Launch and Associated Services in accordance with the United States policy governing launch assistance approved by the President of the United States on August 6, 1982," controlled over the more general language of Article XV of the LSA.[3] *Hughes,* at 958. We con-

---

3. This Article provided:

NASA shall provide Launch and Associated Services under this Agreement to the extent con-

cluded that Article IV "does require NASA, absent the successful assertion of another defense in this case, to bear the cost of changes in launch priority and scheduling resulting from the revised policy." *Id.* at 959.

■ We also vacate the Claims Court's holding as to Count III because we agree with ASC that summary judgment was inappropriate.[4] We review grants of summary judgment de novo. "In considering a motion for summary judgment, all justifiable inferences are to be drawn from the underlying facts in favor of the party opposing summary judgment." *Turner v. United States,* 901 F.2d 1093, 1095 (Fed.Cir.1990). ASC argues that the Smith letter constituted the authorization contemplated by the Agreement. ASC also asserts that the June 22, 1989, letter authored by the Under Secretary of Defense could be interpreted to mean that DOD was not sponsoring a reversal of the space policy in general, but that it felt the ASC-2 qualified as a national security payload. These are not implausible interpretations. In finding that the "later correspondence made it clear that the Department was not prepared to challenge the [Economic Policy Council's] determination as to the classification to be afforded each payload," and that ASC did not receive the proper authorization, the Claims Court drew factual inferences against ASC.

Summary judgment is inappropriate where genuine issues of material fact exist. *National Cable Television Ass'n v. American Cinema Editors, Inc.,* 937 F.2d 1572, 1576 (Fed.Cir.1991); *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir. 1987). Because the import of the correspondence between NASA and DOD is not readily apparent from the letters themselves, summary judgment should not have been granted. Should it be necessary for the trial court to address this issue on remand, it needs further to develop the record.

sistent with the United States' obligations ... United States' Law and United States' published policy.

4. The Claims Court's ruling on Claim III was limited to its determination that the three letters

*Conclusion*

Accordingly, the judgment of the Court of Federal Claims is reversed in-part and vacated in-part, and the case is remanded for further proceedings consistent with this opinion.

## COSTS

American Satellite Company shall have its costs.

**REVERSED IN-PART, VACATED IN-PART, AND REMANDED.**

showed that ASC did not receive the authorization required by the Agreement. Because we vacate the summary judgment, we do not address the parties' additional arguments.