**AMERICAN SATELLITE COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 525–89C.

United States Court of Federal Claims.

Nov. 30, 1995.

Caryl A. Potter, III, Washington, DC, with whom were Samuel J. Wilson, McLean, Vir-

ginia, Elizabeth A. Ferrell, Joseph P. Hornyak, and Debra A. McGuire, Washington, DC, for plaintiff.

Geoffrey C. Cook, with whom were Assistant Attorney General Frank W. Hunger, and David M. Cohen, Washington, DC, for defendant. June W. Edwards, National Aeronautics and Space Administration, Washington, DC, of counsel.

## OPINION

BRUGGINK, Judge.

In *American Satellite Co. v. United States*, 26 Cl.Ct. 146 (1992) (hereafter *"ASC I"*), this court granted defendant's motion for summary judgment as to the three counts then remaining in this proceeding. That decision was reversed in part, vacated in part, and remanded by a decision of the United States Court of Appeals for the Federal Circuit. *American Satellite Co. v. United States*, 998 F.2d 950 (Fed.Cir.1993) (hereafter *"ASC II"*). The Federal Circuit reversed this court's holding that the American Satellite Company ("ASC")[1] could not recover damages under its August 3, 1984, Launch Service Agreement ("LSA") with the National Aeronautics and Space Administration ("NASA") where NASA's failure to launch ASC's spacecraft was the result of a change in United States space policy announced by the President. *Id.* at 951. In addition, the Federal Circuit vacated this court's holding that the Government did not breach a follow-on agreement, executed December 6, 1988, because ASC failed to obtain appropriate government clearances authorizing ASC's spacecraft as a priority payload. *Id.* The appeals court held that, absent the successful assertion of another defense in this case, Article IV of the LSA required NASA to bear the cost of changes in launch priority and scheduling resulting from policy revisions. *Id.* at 953. At this time, only Counts II and III of the complaint remain.[2] Both parties have filed motions for summary judgment on Count II. After carefully considering the parties' written and oral arguments, the court concludes that plaintiff's motion should be granted and defendant's motion should be denied.

## FACTUAL BACKGROUND [3]

Under the terms of the LSA, NASA was to use its "best efforts" to launch two ASC satellites aboard the Shuttle.[4] The LSA incorporated the August 6, 1982 policy with respect to priorities for scheduling payloads. That policy included the following statement: "foreign users ... will be charged on the same basis as comparable non-U.S. Government domestic users. With respect to priority and scheduling, such launchings will be dealt with on the same basis as U.S. launchings." NASA's obligations under the LSA were to remain in effect until September 1995, or until both satellites were launched, whichever came first. The first satellite, ASC–1, was launched by the Shuttle on August 27, 1985. The second satellite, ASC–2, was scheduled to be launched on January 27, 1987.[5]

On January 28, 1986, the Shuttle Challenger was destroyed in a fiery explosion shortly after take-off from the Kennedy Space Center at Cape Canaveral, Florida. As a result of the loss of the Challenger, the NASA Shuttle fleet was reduced from four Shuttles to three. At the time of the Challenger accident, NASA had entered into LSAs obligating it to launch forty-four other commercial payloads, including ASC–2. The payloads were listed on the Shuttle manifest in

---

1. The plaintiff is now doing business under the name "Contel ASC."

2. The complaint contained four counts. Count I was dismissed early in the litigation for failure to state a claim, and the dismissal of Count IV was not included in the appeal to the Federal Circuit.

3. The facts are taken directly from uncontroverted facts presented in the parties' earlier cross-motions, as reflected in this court's earlier decision, *ASC I*, and from the parties' proposed findings of uncontroverted fact associated with the present cross-motions.

4. The term "Shuttle" will be used throughout this opinion to denote the fleet of Space Shuttles.

5. At the time of the signing of the LSA, ASC–2 was assigned a "Planned Launch Date" of October 13, 1986. The parties agree that NASA was within its powers under the LSA to reschedule ASC–2 to a "Firm Launch Date" of January 27, 1987.

chronological order of their "Planned" or "Firm Launch Date." [6] As of the date of the Challenger accident, ASC-2 was listed seventh on the manifest.

The aftermath of the accident saw a flurry of activity, particularly with regard to commercial payloads. Rear Admiral Richard H. Truly, then the Associate Administrator of the Office of Space Flight at NASA, via letter dated April 17, 1986, apprised ASC of the status of NASA's effort to formulate a new manifest. In the letter, Admiral Truly stated that NASA was doing all it could to lessen the impact of the accident on the commercial users. To that end, Admiral Truly promised that the commercial payloads would "primarily be scheduled according to their launch sequence prior to the [Challeng-

6. The LSA defines "Planned Launch Date" as:

> the date, which initially defines the beginning of the interval during which launch is to occur, agreed to by the parties at the time of execution of the Agreement, at the time the Customer exercises a launch option given in this Agreement or at the time a Payload launch is rescheduled to occur greater than one year thereafter.

ASC Launch Services Agreement, Art. XX, ¶ 21. "Firm Launch Date" is defined as:

> the date established on or about one year before the Planned Launch Date or at the time a Payload launch is rescheduled to occur within one year after the date of rescheduling. The original Firm Launch Date defines the beginning of the reduced interval during which launch is to occur.

*Id.* ¶ 10.

7. The President issued the following statement:

> I am announcing today two steps that will ensure America's leadership in space exploration and utilization. First, the United States will, in FY 1987, start building a fourth space shuttle to take the place of the *Challenger*, which was destroyed on January 28th. This decision will bring our shuttle fleet up to strength and enable the United States to safely and energetically project a manned presence in space.
>
> Without the fourth orbiter, NASA's capabilities would be severely limited and long-term projects for development of space would have to be either postponed, or even canceled. A fourth orbiter will enable our shuttles to accomplish the mission for which they were originally intended and permit the United States to move forward with new, exciting endeavors like the building of a permanently manned space station.

er] accident." NASA then sent another letter to ASC dated June 3, 1986, in which NASA told ASC that ASC-2 had been given a new launch date in December 1989.

NASA's intentions, however, were not to be fulfilled. After months of hearings, testimony, and debate on the future of the Shuttle program, President Reagan announced on August 15, 1986, that the United States was pulling out of the commercial launch business and that the Shuttle would no longer be used to launch commercial payloads. In the announcement, the President expressed his belief that the private sector would step forward and develop a satellite launch industry to fill the void left by NASA's departure from the business.[7]

> My second announcement concerns the fundamental direction of the space program. NASA and our shuttles will continue to lead the way, breaking new ground, pioneering new technology, and pushing back the frontiers. It has been determined, however, that NASA will no longer be in the business of launching private satellites.
>
> The private sector, with its ingenuity and cost effectiveness, will be playing an increasingly important role in the American space effort. Free enterprise corporations will become a highly competitive method of launching commercial satellites and doing those things which do not require a manned presence in space. These private firms are essential in clearing away the backlog that has built up during this time when our shuttles are being modified.
>
> We must always set our sights on tomorrow. NASA and our shuttles can't be committing their scarce resources to things which can be done better and cheaper by the private sector. Instead, NASA and the four shuttles should be dedicated to payloads important to national security and foreign policy, and, even more, on exploration, pioneering and developing new technologies and uses of space. NASA will keep America on the leading edge of change; the private sector will take over from there. Together, they will ensure that our country has a robust, balanced, and safe space program.
>
> It has been over 6 months since the tragic loss of the *Challenger* and her gallant crew. We have done everything humanly possible to discover the organizational and technical causes of the disaster and to correct the situation. The greatest tribute we can pay to those brave pathfinders who gave their lives on the *Challenger* is to move forward and rededicate ourselves to America's leadership in space.

Statement by the President, 22 WEEKLY COMP. PRES. Doc. 1103–04 (Aug. 15, 1986).

The President's announcement left the Government with the problem of what to do with the 44 commercial payloads that were manifested as of the date of the Challenger accident. At a press conference, also held on August 15, 1986, the President's press secretary, Larry Speakes, told reporters that a working group of the President's Economic Policy Council ("EPC")[8] would set priorities among these 44 payloads and advise their owners as to when they might be launched. Mr. Speakes would not be specific as to how the payloads would be prioritized, but he did suggest that special consideration would be given to those payloads that required a manned presence for deployment and those that had national security or foreign policy implications.

The EPC provided the President with a plan for shifting the 44 commercial payloads from the Shuttle to the private sector. The plan put commercial payloads into four categories:

I. Shuttle unique[9]

II. National security and foreign policy

III. Costly to retrofit

IV. Remainder

The plan offered three options from which the President could choose. Under the first option, only the first two categories, consisting of twenty satellites, would be manifested on the Shuttle. Under the second option, the thirty-one payloads falling within the first three categories would be included on the new post-Challenger manifest. The third option had all forty-four commercial payloads being scheduled for Shuttle launch. NASA, still hoping for a more economically self-sufficient Shuttle program, argued in favor of either the second or third options, so that at least it could launch thirty-one payloads, if not all forty-four. The Department of Transportation, on the other hand, favored the cancellation of all of the LSAs, in order to foster a more rapid development of unmanned expendable launch vehicles ("ELV's") by private industry. The EPC decided to recommend the first option, manifesting only those commercial payloads that were shuttle-unique or had national security or foreign policy implications.

According to a document entitled "Space Shuttle Contracts, Forty Four Commercial/Foreign Payloads," prepared by NASA at the urging of the EPC, five payloads had national security implications, twelve had foreign policy implications, and three[10] were shuttle-unique. Thus, only twenty of the forty-four commercial payloads on the pre-Challenger manifest qualified for an exception from the President's ban. Apparently, the White House hoped that the remaining commercial payloads would be launched by the infant, private ELV industry alluded to in (and essentially created by) the President's August 15, 1986, announcement. ASC–2 fell into this remaining class of twenty-four satellites having neither national security nor shuttle-unique status.

On September 25, 1986, Alfred H. Kingon, the President's Cabinet Secretary, sent a memorandum to NASA's Administrator, Dr. James C. Fletcher, announcing that the President adopted the EPC recommendation. According to the memorandum, the President ordered that:

> NASA shall no longer provide launch services for commercial and foreign payloads subject to exceptions for payloads that: (1) are Shuttle-unique; or (2) have national security or foreign policy implications.
>
> . . . .

---

8. The Economic Policy Council was created by President Reagan in 1985 to advise him on "national and international economic policy." Statement on the Creation of two Cabinet–Level Bodies, 1985 Pub.Papers 437 (Apr. 11, 1985). The council consisted of the "Secretaries of State, Treasury, Agriculture, Commerce, and Labor, the Director of the Office of Management and Budget, the United States Trade Representative, and the Chairman of the Council of Economic Advisers." *Id.* Mr. Speakes said at the press conference, however, that NASA, the National Security Council, and the Department of Transportation were also represented in the working group of the EPC.

9. "Shuttle-unique" is a term of art referring to a payload that is designed in such a way that it cannot be launched by any other method, such as aboard an unmanned expendable launch vehicle.

10. Actually eight payloads were found to be shuttle-unique, but five of those eight also had either national security or foreign policy implications.

NASA will revise its manifest to include only those payloads that are either Shuttle-unique or have national security and foreign policy implications. The manifest will then be made public, with the expectation that current customers who are not included on the manifest will voluntarily seek launch opportunities elsewhere.

Thus, those satellites having either national security or shuttle-unique status (or both) were excepted from the President's ban on commercial use of the Shuttle.

On October 3, 1986, NASA issued a telegraphic message addressed to the "Commercial and Foreign Customers" of the Shuttle. The message announced the new manifest of commercial payloads for the Shuttle. The new manifest was comprised solely of those twenty payloads that met the criteria set forth in the President's order. ASC–2, though slated to be launched seventh on the pre-Challenger manifest, was not included on the new manifest. In fact, only two of the twenty payloads on the new manifest had previously held higher positions than ASC–2 on the pre-Challenger manifest. In effect, NASA, at the President's direction, reshuffled the priorities of the forty-four commercial payloads, paying very little heed to the pre-Challenger manifest.[11] As a result, several payloads originally having no priority over ASC–2 leapfrogged over and bumped ASC–2 off the Shuttle manifest.

By letter dated October 30, 1986, NASA's General Manager, Philip E. Culbertson, informed ASC that pursuant to current "White House policy," there was no launch date on the current manifest for ASC–2. The letter explained that the new manifest represented the Shuttle "launch schedule through calendar year 1994," and was necessary because "launch requirements . . . far exceed current capacity." The letter went on to predict that: "[i]t appears almost certain you will not be provided launch services either prior to or after your current contract expires in September 1995."

ASC's LSA provides that if NASA delays a launch for more than nine months after the planned or firm launch date, ASC may terminate the LSA and receive a refund of its progress payments. By October 30, 1986, ASC's progress payments for the launch of ASC–2 totalled $8,994,844. In the October 30 letter, NASA advised ASC of the availability of this termination option.

ASC, however, chose not to terminate the LSA, but instead informed NASA by letter dated February 6, 1987, that it considered NASA's actions a "breach and final repudiation" of the LSA and demanded that NASA return its progress payments. NASA returned the payments on April 10, 1987.

ASC was still hopeful of getting its remaining satellite on the Shuttle manifest. On December 6, 1988, NASA and ASC executed a document entitled an "Agreement," which provided that if ASC was able to secure the appropriate "governmental clearances" by January 31, 1989, i.e., the conferral of "national security" status, then NASA would grant ASC–2 a new proposed launch date. It was expressly stated that neither party waived any rights it had under the LSA as a result of the promises contained in this document.

ASC's efforts to secure governmental clearance for ASC–2 prompted the following exchange of correspondence. First, ASC's request for national security certification was forwarded to Lieutenant General John T. Myers, Director of the Defense Communications Agency. On January 17, 1989, General Myers wrote a memorandum to Gordon A. Smith, Assistant Secretary of Defense, Office of Command, Control, Communications and Intelligence, which stated that ASC–2 would be "the only readily available domestic satellite" possessing certain encryption technology required for government communications pursuant to national security policy directives. Based on Gen. Myers' assertions, Mr. Smith sent a letter dated January 26,

---

**11.** The message stated, however, that: "Within the priority category foreign and commercial, the priority has been given to those payloads which are shuttle-unique and these which have national security and foreign policy considerations. These as a group, to the extent practicable have been manifested using the pre [Challenger] sequence as a guideline." The actual ordering of the payloads on this first post-Challenger manifest has no real relevance to this case since no matter how the chosen 20 were ranked, ASC–2 was left off the list.

1989, to Dr. Fletcher at NASA stating that Smith had "determined that the services to be provided by the ASC–2 satellite have national security implications. Therefore, NASA is authorized to process the ASC–2 satellite as involving national security interest when manifesting space shuttle payloads."

Unfortunately for ASC, Smith's determination alone was not enough to put ASC–2 on the Shuttle manifest. On February 21, 1989, Kenneth S. Pedersen, NASA's Associate Administrator for External Affairs, wrote Smith that he had been contacted by representatives of both the Office of International Security Policy and the Air Force. Those individuals told Pedersen that contrary to the statements in Smith's January 26, 1989 letter, "the issue of [ASC–2's] national security implications was still under review within the [Department of Defense] and that no final decision had been made." Pedersen informed Smith that NASA could not change the priority determination of a satellite unless NASA was sure that the Defense Department was "explicitly recommending such a modification and that the position conveyed in your letter represents a formal agency-wide DOD determination."

On June 22, 1989, the Under Secretary of Defense wrote to Admiral Truly, who by this time was the Acting NASA Administrator, to clarify the Defense Department's position. After a summary of the communications between the Department and NASA up to that point, the letter states:

> On behalf of the Secretary of Defense, I would like to affirm the DoD interest in the ASC–2, based upon the planned use of leased circuits and on this satellite's compliance with national policy concerning the protection of its command and control links. However, this should not be construed as DoD sponsoring a modification of the existing National Space Policy, or a reversal of the previous Presidential decision on the provision of launch services by NASA for commercial payloads that removed ASC–2 from the Shuttle manifest.

NASA did not treat this as a clear directive from the Defense Department to reclassify ASC–2 as having national security implica-

tions. Therefore, it did not add ASC–2 to the post-Challenger manifest. The satellite was never rescheduled and ASC subsequently turned to another source to launch its satellite.

### PROCEDURAL POSTURE

Only two counts remain. Count II, the subject of the present motions, alleges that NASA breached the LSA when it treated the President's post-Challenger directives as precluding launch. Count III, not the subject of either motion, alleges that NASA breached the December 6, 1988, agreement by not rescheduling ASC–2 pursuant to the new policy directives.

In *ASC I*, and in the companion case, *Hughes Communications Galaxy, Inc. v. United States*, 26 Cl.Ct. 123 (1992) (hereafter "*Hughes I*"), rev'd, 998 F.2d 953 (1993) (hereafter "*Hughes II*"), this court held that although the LSA was a binding contract, there was no breach of the LSA by the Government because the President's change in space policy which led to the non-launch of ASC–2 was a sovereign act. The court reasoned that Article XV of the LSA incorporated the sovereign act defense by its terms and that the LSA was, therefore, explicitly made subject to changes in space policy. *Hughes I*, 26 Cl.Ct. at 158. In *Hughes I*, this court held that the contract was impressed with an inherent degree of uncertainty, given the nature of the space program. The court explained its view that, even in the absence of Article XV, the parties had not explicitly contracted away the Government's power to alter policy regarding use of the Shuttle in response to legitimate public and general concerns. *Id.* at 144. With respect to Count III, this court held that the documentary record was undisputed that ASC had failed to obtain the necessary reclassification of ASC–2 as having national security implications, and so could not meet its obligations under the December 6, 1988, agreement.

On appeal, this court's rulings with respect to both counts were rejected. In pertinent part, the Federal Circuit held:

> We reverse and remand the Claims Court's judgment on Count II of ASC's complaint on the basis of our opinion in

[*Hughes II* ]. There, we held that Article IV of the LSA, which obligated NASA to "provide Launch and Associated Services in accordance with the United States policy governing launch assistance approved by the President of the United States on August 6, 1982," controlled over the more general language of Article XV of the LSA.... We concluded that Article IV "does require NASA, absent the successful assertion of another defense in this case, to bear the cost of changes in launch priority and scheduling resulting from the revised policy."

We also vacate the Claims Court's holding as to Count III because we agree with ASC that summary judgment was inappropriate.... ASC argues that the Smith letter constituted the authorization contemplated by the [December 6, 1988] agreement. ASC also asserts that the June 22, 1989, letter authored by the Under Secretary of Defense could be interpreted to mean that DOD was not sponsoring a reversal of the space policy in general, but that it felt the ASC–2 qualified as a national security payload. These are not implausible interpretations.

... Because the import of the correspondence between NASA and DOD is not readily apparent from the letters themselves, summary judgment should not have been granted. Should it be necessary for the trial court to address this issue on remand, it needs further to develop the record.

*ASC II,* 998 F.2d at 952–53 (citations omitted) (footnotes omitted). The Federal Circuit's reasoning in *Hughes II,* adopted in the reversal here, teaches a more restrictive view of the sovereign acts doctrine, and its fellow traveler, the "unmistakability doctrine," than that used in this court's earlier decision. The Federal Circuit held that the Government's sovereign power to act in apparent contravention of a contract obligation cannot be *enjoined* absent an unmistakable written expression. *Hughes II,* 998 F.2d at 958. But it held that monetary relief would not be foreclosed if the Government's general and sovereign acts would otherwise amount to a breach of contract. *See id.* at 958–59.

On remand, plaintiff has filed a Motion for Summary Judgment on Count II of the Complaint requesting this court to hold that the Government breached the rescheduling provisions of the LSA. ASC argues that all but one of the defenses available to the Government were rejected by the Federal Circuit's decision, either expressly or implicitly. Although plaintiff concedes that the Government would not be liable for breach of the LSA if it were to prove that ASC had no rescheduling rights under the August 6, 1982 policy, plaintiff argues that this defense is unavailable to the Government in light of the Government's admission that, but for the September 1986 Presidential directive, plaintiff's ASC–2 satellite would have been scheduled on the October 1986 manifest. Plaintiff requests that all future proceedings in this matter be limited to a determination of the amount of damages owed to it.

Defendant has filed a Cross Motion for Summary Judgment requesting this court to find for the Government on the question of liability and to dismiss plaintiff's complaint. Defendant argues that it has not breached the LSA and that it is shielded from liability by certain contractual defenses, including the "best efforts" clause, the "termination" clause, and the "waiver" clause.

## DISCUSSION

Much of the present dispute between the parties turns on the effect of the Federal Circuit decision. In that respect, the "decision" includes the holding of the appeals court in the companion case, *Hughes II.* The critical language in that opinion is the Federal Circuit's statement that NASA, absent the successful assertion of another defense, must bear the cost of changes in launch priority and scheduling resulting from the revised Shuttle policy. *Hughes II,* 998 F.2d at 959. In other words, unless the Government is able to demonstrate the existence of a defense that was not considered and rejected by the Federal Circuit, under the law of the case doctrine, the Government bears the financial responsibility for damages incurred by ASC as a result of the implementation of the 1986 Shuttle policy. In re-

sponse, the Government asserts four independent defenses.

■ The first of these defenses relies on the LSA's "best efforts" language. The introductory paragraph in Article I of the LSA states: "All Launch and Associated Services to be furnished by NASA to the Customer under this Agreement shall be so furnished by NASA using its best efforts." According to the Government, this sentence makes clear that NASA, not any other part of the Federal Government, is furnishing the launch services and that the services are subject only to NASA's best efforts. In other words, the Government argues that the sole promisor on its side of the LSA is NASA. NASA promises to use its "best efforts" to effectuate the launch of plaintiff's satellite. The Government as a whole makes no such promise.

In support of this view, the Government points to language in both Articles IV and VII of the LSA which give both the customer and NASA the right to postpone or terminate launch services for "Reasons Beyond NASA's Control." This term is defined in Article XX as "reasons which include, but are not limited to ... acts of the United States Government other than NASA, in either its sovereign or contractual capacity...." From this language the Government argues that ASC knew before it signed the LSA that, while NASA undertook to furnish its best efforts, acts of the United States Government other than NASA would be a proper basis for NASA's not providing launch services.

The Government argues that in the interim between the Challenger disaster and the President's implementation of the 1986 Shuttle policy, NASA satisfied its "best efforts" obligation by making sincere and earnest, good faith efforts to furnish launch services to plaintiff and its other customers. The Government describes in great detail the efforts made by NASA in its attempt to reschedule the launch services affected by the Challenger explosion. In addition, the Government notes that ASC recognized that the constraints upon NASA would require substantial postponement of the launch of its satellite.

The Government argues that after President Reagan issued his 1986 Shuttle policy directive to NASA, it was effectively impossible for NASA, despite its best efforts, to launch ASC–2. According to the Government, NASA recognized that the President's prioritization of the now-limited national launch capacity would, in the absence of different directions from the President, make it impossible for NASA to furnish launch services to ASC.

Because NASA did in fact use its "best efforts" to effectuate the launch of plaintiff's satellite and because its non-launch was caused by the implementation of a policy change by an independent government actor to whom NASA was statutorily obligated to obey, the Government argues that it has not violated any promise in the LSA and, is therefore, not liable to plaintiff for any damages.

The Government's "best efforts" defense is ultimately premised on the fact that the failure to launch plaintiff's satellite was caused by the President's adoption of the 1986 Shuttle policy. In other words, even though NASA used its "best efforts," it was unable to launch plaintiff's satellite because of the change in policy. This, however, is precisely the scenario for which the Federal Circuit determined that NASA would be financially accountable to plaintiff. The argument, in short, was previously rejected by the Federal Circuit. In its opinion reversing this court's earlier decision, the Federal Circuit clearly held that the Government had contractually agreed to accept financial responsibility for costs associated with a change in satellite launch and scheduling policy. The fact that it was not NASA that developed or chose this new policy was deemed irrelevant by the Federal Circuit. The court explained:

[T]he present case simply involves the question of how liability for certain contingencies was allocated by the contract. In its contractual capacity, the government executes countless agreements with private entities to receive and provide services, goods and supplies. These contracts routinely include provisions shifting financial responsibility to the government for events which might occur in the future.

That some of these events may be triggered by sovereign government action does not render the relevant contractual provisions any less binding than those which contemplate third party acts.... The policy approved by the President on August 6, 1982, remained controlling "[w]ith respect to launch priority and scheduling" as provided in Article IV. Our conclusion does not prevent the President or Congress from implementing space policy, but does require NASA, absent the successful assertion of another defense in this case, to bear the cost of changes in launch priority and scheduling resulting from the revised policy.

*Hughes II*, 998 F.2d at 958–59. It would be fundamentally inconsistent with the Federal Circuit's decision to hold that the United States is not liable as a party defendant because NASA's inability to act was due to the President's directive. Under the law of the case doctrine, this defense must be rejected.

The court notes, moreover, that it rejected this same argument in *Hughes I*. It held that "[A]n announcement by NASA that it would not try to launch Hughes' satellite would be inconsistent with the ... obligation [to use its best efforts to launch]." In effect, the court rejected the distinction between NASA's efforts and those of "the Government," outside the, now-rejected, potential application of the sovereign acts doctrine. In the absence of any other specific contractual basis for treating the LSA as binding only NASA, and not the Government at large, and because the sovereign acts doctrine is not available as a defense, there is no reason to artificially divide the Government as obligor. NASA's obligations under the LSA became those of the United States. Although the United States was only obligated to *perform* to the extent of NASA's best efforts, the balance of the Government could not thwart NASA's efforts without causing a breach. As we held in *Abundis v. United States*, 15 Cl.Ct. 506 (1988): "When actions are brought in this court pursuant to 28 U.S.C. § 1491(a)(1), there is only one defendant— the Federal Government. RUSCC 10(a) ('the United States shall be designated as the defendant in every case')." *Id.* at 512. It

follows that the decision not to launch ASC–2 due to the change in policy constituted a breach of the LSA's requirement that NASA use its best efforts. Absent some other defense, the United States would be responsible for any costs attributable to the failure to launch.

■ The Government's second defense is that the 1982 and 1986 Shuttle policies were not inconsistent and hence NASA did not breach Article IV of the LSA when it determined that ASC's satellite would not be launched. It contends that "because the 1986 policy directive did not conflict with the 1982 policy statement and because the President consistently retained the authority to establish launch categories and assign priority to such categories, NASA's compliance with the 1986 directive was consistent with the terms of the LSA." Def. Brief of Mar. 23, 1995, at 19. The Government argues that the 1982 Shuttle policy was designed to ensure equal treatment for all commercial payloads, both foreign and domestic. The President's prioritization of satellites in favor of those that were either shuttle-unique or those that had national security/foreign policy implications applied equally to both foreign and domestic customers. Thus, the Government argues, when NASA adhered to the 1986 Shuttle policy and continued to treat foreign and domestic satellites on a nondiscriminatory basis, it acted consistently with, and not in breach of, the scheduling provisions of Article IV of the LSA.

There are two insuperable problems with this argument. The first is that it is completely at odds with the Government's position as to the "best efforts" clause. In the same brief quoted above, the Government concedes that "[o]n September 25, 1986, President Reagan issued a directive to NASA that effectively made it impossible for NASA, despite its best efforts, to launch ASC's commercial payload." *Id.* at 12. If the policy was no different in 1986, then why was it necessary to re-prioritize the payloads? What the Government is in effect saying is that implicit in the 1982 policy was the possibility that a wholly different basis of distinguishing payloads could be introduced.

The court finds, however, that the imposition of a new standard, particularly one that creates the possibility that some previously eligible payloads cannot be launched at all, constitutes a change in policy. The best evidence of this is that, under the old policy, ASC–2 was seventh on the manifest with a "Planned Launch Date" of October 13, 1986, yet under the new policy, it was ineligible for launch. The court made substantially the same finding earlier in *Hughes I*:

> The LSA incorporated, as between commercial users, those priorities set forth in the August 6, 1982 policy statement, which did not differentiate between commercial users.... NASA announced that it was constrained by "the priorities from which we have developed this manifest," i.e., the President's direction that only certain types of commercial payloads would be flown. In the absence of some legal justification, therefore, this would have constituted an anticipatory breach.

*Hughes I*, 26 Cl.Ct. at 135. There is no reason to make a different finding on the record in this case. The court finds that there is no factual merit in the Government's argument.[12]

The second problem with the argument that NASA's post-Challenger treatment of ASC–2 is consistent with the 1982 policy is that it is at odds with the fair import of the Federal Circuit's opinion. The court stated: "Our conclusion ... does require NASA ... to bear the cost of changes in launch priority and scheduling resulting from the revised [1986] policy." 998 F.2d at 953. Presumably the court would not have made that statement if it perceived an outstanding issue as to whether in fact the President's directive worked a revision in policy. Moreover, the real import of the Government's argument is that, imbedded, yet unarticulated, in the 1982 policy, is the possibility that the President can "establish launch categories and assign priority to such categories." Def. Brief of Mar. 23, 1995, at 19. This power must have

a source either in the contract itself, or in the inherent powers of the President. The first possibility was squarely rejected by the Federal Circuit. As to the second, the court held that, while the contract could not bar the President from making changes in policy, neither it, nor the sovereign act doctrine, insulates the Government from the charge that such action constitutes a breach of the LSA.

■ The third defense invoked by the Government is that the combination of the President's September 1986 directive to NASA and NASA's October 30, 1986, letter to ASC constituted a de facto termination of the LSA, within the meaning of Article VII of the LSA. That provision permits NASA to terminate the LSA based upon "a determination in writing that NASA is required to Terminate such services for Reasons Beyond NASA's Control." The phrase "Reasons Beyond NASA's Control" is defined in the LSA to include "acts of the United States Government other than NASA, in either its sovereign or contractual capacity." According to the Government, the President's September 1986 directive was "an act of the United States Government other than NASA." Because this directive was, as a practical matter, fatal to any chance at a launch for ASC, the Government argues that the October 30 letter was a de facto termination of the LSA.

■ The court is mindful that its decision in *Hughes I* provides support for this argument.[13] The court holds, however, that resurrecting that analysis would be inconsistent with the Federal Circuit's mandate. *See In Re Roberts*, 846 F.2d 1360, 1363 (Fed.Cir. 1988) ("[U]pon reversal and remand for further consistent proceedings, the case goes back to the trial court and there stands for a new determination of the issues presented as though they had not been determined before, pursuant to the principles of law enunciated in the appellate opinion, which must be taken as the law of the case."). *See also W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 842 F.2d 1275, -

---

12. In addition, the court notes that the Government has stipulated that ASC was not assigned a launch date on the official October 1986 manifest because it did not meet the new requirements.

13. The court held that the combined effects of the President's directive and NASA's actions constituted "a de facto termination." 26 Cl.Ct. at 136. The court did not rule on whether Article VII had been invoked, however. *Id.* at 135.

1278 (Fed.Cir.1988); *Bankers Trust Co. v. Bethlehem Steel Corp.,* 761 F.2d 943, 950 (3d Cir.1985). The mandate doctrine applies not only to issues discussed and decided, but also to those decided by necessary implication. *Knotts v. United States,* 893 F.2d 758, 761 (5th Cir.1990); *Smith Int'l, Inc. v. Hughes Tool Co.,* 759 F.2d 1572, 1577 (Fed.Cir.), *cert. denied,* 474 U.S. 827, 106 S.Ct. 87, 88 L.Ed.2d 71 (1985). As the Second Circuit taught recently, the trial court's actions on remand should not be inconsistent with "either the express terms or the spirit of the mandate." *Ginett v. Computer Task Group, Inc.,* 11 F.3d 359, 361 (2d Cir.1993).

A fair reading of the two appellate decisions is that policy changes subsequent to the execution of the LSA cannot excuse the Government from its contractual obligation to perform in accordance with the 1982 policy. Yet the real import of the Government's present argument is that the very policy change which the Federal Circuit held could not constitute an excuse for non-performance is a "reason beyond NASA's control," hence justifying invocation of the termination clause. This court holds that it would be inconsistent with the mandate to find that the termination clause incorporated the possibility that policy changes in 1986 could absolve the Government of an obligation to attempt to perform according to the 1982 policy.

■ The final defense raised by the Government is that ASC expressly waived any right it may have had to bring a claim against the Government for failure to launch. In support of this argument, the Government relies on Article V of the LSA, which contains the contractual provisions dealing with the allocation of risks between the parties. Specifically, the Government cites paragraph 4 of Article V as the basis of its waiver defense. This paragraph states:

> Without affecting the right of the Customer to pursue the procedure under the Disputes provision set forth in Article XVIII of this Agreement, the Customer shall not make any claim against the United States Government ... for Damage or other relief ... for the non-performance or improper performance of Launch and Associated Services....

Based upon this provision, the Government argues that ASC unambiguously waived any right that it otherwise might have had to sue the Government for costs arising from NASA's failure to launch the payloads that were the subject of the LSA.

According to the Government, ASC's waiver in Article V, paragraph 4, was part of a larger agreement between it and NASA that was designed to permit commercial participation in the shuttle program by holding the Government harmless from the risks inherent in space flight. As support for the existence of this larger agreement, the Government relies on Article V, paragraph 3b of the LSA. This provision states:

> [T]he parties recognize that all participants in STS Operations are engaged in the common goal of meaningful exploration, exploitation and uses of outer space. In furtherance of this goal, the parties hereto agree to a no-fault, no subrogation, inter-party waiver of liability pursuant to which each party agrees not to bring a claim against or sue the other party.... Thus, the parties, by absorbing the consequences of damage to their property and employees without recourse against each other ... jointly contribute to the common goal of meaningful exploration of outer space.

Based upon these contractual provisions, the Government argues that it is clear that the parties were prepared to absorb serious financial consequences without recourse against each other in order to further space exploration and exploitation. The Government characterizes ASC as a sophisticated contracting party that accepted this limitation on claims against the Government during the course of arms-length bargaining. In sum, the Government argues that the parties' agreement in the LSA concerning the waiver of claims for the nonperformance of launch services was a carefully considered, substantive, and purposeful part of their overall agreement. It relies on *Marks v. United States,* 24 Cl.Ct. 310 (1991), where this court found that a clause limiting liability to the return of a deposit was enforceable. The

court in *Marks*, in turn, relied on *Wise v. United States*, 249 U.S. 361, 365, 39 S.Ct. 303, 304, 63 L.Ed. 647 (1919), and *High Plains Natural Gas Co. v. Warren Petroleum Co.*, 875 F.2d 284, 287 (10th Cir.1989).

The court finds that the principle that can be extracted from those decisions is inapposite here. They stand for the unremarkable proposition that parties are free to limit damages by stipulation, even if, in retrospect, they are an inaccurate measure of the results of breach. The real question here is somewhat different: whether Article V should be construed to apply when one party chooses not to honor the contract's obligations.

The decision in *Freedman v. United States*, 162 Ct.Cl. 390, 392, 320 F.2d 359, 366 (1963), is instructive. There, the Government declined to ship certain military hardware, despite a contractual obligation to do so, because "the State Department felt that it was inopportune to ask the British Government for an export permit." 162 Ct.Cl. at 402, 320 F.2d at 366. The Government contended that the waiver of liability clause precluded a recovery. That clause provided that, even if liability for breach were established, damages would be limited to a return of purchase price. Before addressing that point the court stated the following, applicable here in light of the Federal Circuit's construction of the LSA:

> The doctrine of "public and general" "sovereign acts", laid down in *Horowitz v. United States*, 267 U.S. 458 [45 S.Ct. 344, 69 L.Ed. 736] (1925), does not relieve the Government from liability where it has specially undertaken to perform the very act from which it later seeks to be excused.

It then went on to address the alternative argument that damages for non-performance should be addressed under the limitation-of-liability clause:

> We have already ruled ... that paragraph 11 does play a valid part where the Government cancels the sale for such good cause as a newly-discovered need for the property or a significant mistake as to the property offered for sale. But we will not construe the general terms of the paragraph as absolving the Government from all damages where it breaches the contract, without such good reason, because it disagrees with the contractor over the meaning of some provision of the agreement. To read the clause in that unlimited fashion—excusing all damages for any type of breach—would come close to the pit of voidness; the Government would in effect promise nothing although the other party presumably would be bound. Moreover, we have held that general provisions seeming to immunize the Government from paying damages due to its own breach or negligence should be construed, if possible, as not covering serious breaches, especially willful defaults, causing important loss to the contractor. That admonition cautions us to exclude from the generality of paragraph 11 a significant, willful, and unjustified breach, like that present in this case, destroying the heart of the plaintiff's agreement and bringing grave loss.

*Freedman*, 162 Ct.Cl. at 403, 320 F.2d at 366–67. *See also John E. Green Plumbing and Heating Co. v. Turner Constr. Co.*, 742 F.2d 965, 966 (6th Cir.1984) (exculpatory clauses must be strictly construed), *cert. denied*, 471 U.S. 1102, 105 S.Ct. 2328, 85 L.Ed.2d 845 (1985); *Torncello v. United States*, 231 Ct.Cl. 20, 32, 681 F.2d 756, 764 (1982) ("parties may not agree that one or both may walk away from all obligations without rendering the contract unenforceable").

Article V, paragraph 4, along with Article VII (the Termination Clause) of the LSA, purport to operate in much the same way as the clause construed in *Freedman*, and the analysis here should be the same. Article V, paragraph 1, expressly limits application of the waiver clause to "[c]ertain risks of Liability ... arising out of the Launch and Associated Services to be provided by the United States Government...." Under Article II, paragraph 1, and the applicable regulations, "Launch and Associated Services" are defined as standard and optional shuttle services, such as launch and retrieval.[14] The

14. Title 14 of the United States Code of Federal Regulations at Part 1214 relates purely to the

operational aspects of Shuttle launch services.

wording of the contract, in other words, suggests that the Government is protecting itself against risks of failure associated with the operational aspects of the Government's undertaking. To read Article V, paragraph 4, as permitting the Government, without consequence, to willfully change its view about the wisdom of the undertaking, is tantamount to declaring the contract void. The court thus views the LSA as protecting the Government against non-willful breaches of contract.

Nor is it necessary for the court to assign bad motives to the Government in order to make the decision not to launch "wilful." As the Supreme Court has held numerous times, in a civil context, willful conduct is characterized by knowledge and intent, as opposed to accident. *Screws v. United States,* 325 U.S. 91, 101, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945); *United States v. Murdock,* 290 U.S. 389, 394, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933). The decision not to launch in this case was the result of deliberation, not negligence. The hold-harmless clause, therefore, does not afford the Government a defense against a claim for damages in excess of a refund of the purchase price.

 A second reason exists to reject this final defense. Although the opinion issued by the Federal Circuit did not address the waiver question, and although application of the waiver clause does not directly implicate the policy shift in 1986, further consideration of this issue is precluded by the appellate decision. As ASC correctly points out, the law of the case doctrine applies to issues implicitly decided by the appellate court. The Government raised the waiver defense on appeal. *See* Appellee's Brief, No. 92–5136, at 38 (Fed.Cir. January 21, 1993). Trial courts are permitted to assume that alternate grounds to sustain the results below are considered, if urged upon an appellate court. *Knotts v. United States,* 893 F.2d 758, 761 (5th Cir.1990). *See also J.E. Riley Inv. Co. v. Commissioner,* 311 U.S. 55, 61 S.Ct. 95, 85 L.Ed. 36 (1940). It is well-settled that if the decision below is correct, "it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason." *Helvering v. Gowran,* 302 U.S. 238, 245, 58 S.Ct. 154, 157, 82 L.Ed. 224 (1937), *reh'g denied,* 302 U.S. 781, 58 S.Ct. 478, 82 L.Ed. 603 (1938). *See also Wells Cargo, Inc. v. Wells Cargo, Inc.,* 606 F.2d 961, 964 n. 4, 203 U.S.P.Q. (BNA) 564, 567 n. 4 (C.C.P.A.1979) ("An appealed decision must be affirmed if it is sustainable on any ground supported by the record."). If the Federal Circuit had accepted this defense, it would have been required to affirm this court's decision on other grounds and the reversal and remand would have been moot. It is fair to assume that this defense was rejected.

## CONCLUSION

The Federal Circuit's mandate was clear. Absent the assertion of another defense, NASA must "bear the cost of changes in launch priority and scheduling resulting from the revised policy." 998 F.2d at 953. The court has rejected all the Government's defenses. Accordingly, its motion for summary judgment must be denied. ASC's motion for summary judgment is granted as to liability. The parties are directed to consult in an attempt to stipulate to damages. If they are unable to do so, they are to attempt to agree on a schedule for bringing the quantum phase to completion. Defendant is directed to file a joint status report reflecting the parties' agreement, or their respective positions, on or before January 12, 1996.