**HUGHES COMMUNICATIONS GALAXY, INC., Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 92–5137.

United States Court of Appeals, Federal Circuit.

July 7, 1993.

Rehearing Denied; Suggestion for Rehearing In Banc Declined Oct. 26, 1993.

954

Clarence T. Kipps, Jr., Miller & Chevalier, Chartered, Washington, DC, argued for plaintiff-appellant. With him on the brief were Robert K. Huffman, Kevin C. Dwyer and Paul L. Glenchur. Also on the brief were John J. Higgins, John T. Kuelbs, Jennifer Smolker, Scott B. Tollefsen and M. Keith Nocket, Hughes Aircraft Company, Los Angeles, CA.

Terrence S. Hartman, Dept. of Justice, Washington, DC, argued for defendant-appellee. Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Allen D. Bruns, Asst. Director, Commercial Litigation Branch, were on the brief for defendant-appellee. Also on the brief were June W. Edwards, Associate Gen. Counsel and William J. Bierbower, Sr. Atty., Nat. Aeronautics and Space Admin.

Before RICH, MAYER and LOURIE, Circuit Judges.

MAYER, Circuit Judge.

Hughes Communications Galaxy, Inc., appeals the judgment of the United States Court of Federal Claims,[1] 26 Cl.Ct. 123

1. The United States Claims Court was renamed the Court of Federal Claims on October 29, 1992.

Federal Courts Administration Act of 1992,

(1992), which held it could not recover damages under its contract with the National Aeronautics and Space Administration (NASA) when NASA's failure to launch Hughes' satellites was the result of the President's decision to stop launches of commercial satellites. We reverse and remand.

## Background

On December 5, 1985, Hughes Communications entered into a contract with the United States, represented by NASA, in which NASA agreed to use its "best efforts" to launch ten of Hughes' commercial satellites through its Space Shuttle program. At that time, NASA operated a fleet of four manned shuttles. The United States government was then promoting commercial use of its shuttle fleet by private industry to offset the costs of its space program. To further this goal, NASA actively marketed its shuttles as launch vehicles for commercial payloads to both domestic and foreign users.[2]

The contract executed between Hughes and NASA was, as the Claims Court recognized, unique. Labeled a Launch Services Agreement (LSA), the contract provided at the outset that "[a]ll Launch and Associated Services to be furnished by NASA to the Customer under this Agreement shall be so furnished by NASA using its best efforts." Art. I.[3] The contract included a cut-off date of September 30, 1994, at which time NASA's

obligations under the contract would expire, whether or not Hughes' spacecraft had been launched.[4] The LSA also granted both parties termination rights. Hughes was given the right to terminate the contract at virtually any time, provided it pay NASA any costs actually incurred by NASA at the time of termination. Art. VII, ¶ 2. NASA's right to terminate was somewhat more limited, and included the right to terminate "upon a determination in writing that NASA is required to Terminate such services for Reasons Beyond NASA's Control." Art. VII, ¶ 1.a.(iv).

Article I of the contract designated a "Planned Launch Date" for each of Hughes' spacecraft.[5] Three of Hughes' spacecraft were designated as "Scheduled Launches" while the remaining seven were designated as "Standby Launches." Art. I, ¶ 1.a. Standby Launches were subject to more uncertain launch dates, "with each launch to nominally occur within one year following its respective Planned Launch Date." Art. IV, ¶ 1.b.(2). The "Firm Launch Date and Shuttle flight assignment for the Payload will be selected solely by NASA." *Id.* Scheduled Launches, however, were to be "implemented as set forth in Subparagraph 1.a...." Art. IV, ¶ 1.b.(1). Subparagraph 1.a. of Article IV provided that for launches which are not Standby Launches, the Planned Launch Date would mark the beginning of a ninety-day launch period. About one year before this

---

Pub.L. No. 102–572, § 902(a), 106 Stat. 4506 (1992).

2. The history of NASA's entry into the arena of commercial payload launches and the development of United States policy in this area is more fully detailed in the Claims Court's opinion. 26 Cl.Ct. at 125. Because we resolve the issues presented for appeal by looking to the contractual language of the agreement between Hughes and NASA, further elaboration on this background is unnecessary here.

3. Unless otherwise indicated, citations to Article numbers refer to the Articles and subsections contained in the LSA. The contract is divided into four Parts. Part I is comprised solely of Article I and contains the "Customer Unique Provisions" for all or part of the ten Hughes spacecraft. Parts II and III both contain Articles II through VII. Part II pertains to Hughes' spacecraft HC–9 and HC–10. Part III pertains to Hughes' spacecraft HC–11 through HC–18. Where there is no relevant difference between

the Articles of these Parts, the Articles will be cited without reference to a particular Part. Part IV contains Articles VIII through XXI which apply to all ten spacecraft.

4. Article II, ¶ 3 provided:

NASA's obligation to provide Shuttle Launch and Associated Services to the Customer under this Agreement shall remain in force through September 30, 1994 (unless mutually extended by NASA and the Customer) or until all the obligations and responsibilities of the parties herein have been fulfilled, whichever occurs first.

5. Article XX, ¶ 21 of the contract defined "Planned Launch Date" as "the date, which initially defines the beginning of the interval during which launch is to occur, agreed to by the parties at the time of execution of the Agreement, at the time the Customer exercises a launch option given in this Agreement or at the time a Payload launch is rescheduled to occur greater than one year thereafter."

Planned Launch Date, NASA was to assign the payload to a shuttle and establish a Firm Launch Date by coordinating with Hughes and other customers scheduled to share the same shuttle launch. Despite these provisions, Article IV allowed both Hughes and NASA considerable flexibility in the actual launch date of the satellites by permitting both parties to delay or postpone a scheduled launch. Art. IV, ¶¶ 2–5.

In addition, Article XV, entitled "Services Consistent with United States' Obligations, Law and Published Policy" provided that, "NASA shall provide Launch and Associated Services under this Agreement to the extent consistent with the United States' obligations (including any intergovernmental memorandum of understanding entered into by NASA and the Customer), United States' Law and United States' Published Policy." Article IV also addressed NASA's obligation to provide launch services, and provided in relevant part, "With respect to launch priority and scheduling, NASA will provide Launch and Associated Services in accordance with the United States policy governing launch assistance approved by the President of the United States on August 6, 1982. Consistent with this policy, NASA will generally treat all comparable payloads on the same basis." The referenced policy was issued by President Reagan on August 6, 1982, and was entitled "Space Assistance and Cooperation Policy." It provided:

> With respect to the priority and scheduling for launching foreign payloads at U.S. launch sites, such launchings will be dealt with on the same basis as U.S. launchings. Each launching will be treated in terms of its own requirements and as an individual case. Once a payload is scheduled for launch, the launching agency will use its best effort to meet the scheduling commitments. Should events arise which require rescheduling, the U.S. will consult with all affected users in an attempt to meet the needs of users in an equitable manner.[6]

NASA compiled a list of all scheduled payloads to be launched, including Hughes', into a "manifest." The manifest listed commer-

cial payloads in order of their Planned or Firm Launch Dates, and indicated which payloads were to be launched on which shuttle. Hughes' spacecraft were assigned specific slots on this manifest. However, on January 28, 1986, the Shuttle Challenger exploded shortly after takeoff from the Kennedy Space Center at Cape Canaveral, Florida. None of Hughes' spacecraft had been launched at this point, less than two months after Hughes and NASA executed the LSA.

As a consequence of the Challenger tragedy, NASA's shuttle fleet was reduced to three craft. Also, NASA immediately initiated an investigation to determine the cause of the accident. Ultimately, following extensive evaluation of space policy by various governmental entities, the President issued an order on August 15, 1986, in which he announced that NASA would no longer be in the business of launching commercial spacecraft. However, the government was left with the question of how best to handle the remaining 44 commercial payloads it had contracted to launch.

In response to this problem, the government grouped the remaining payloads into four categories—"Shuttle Unique," "National Security and Foreign Policy," "Costly to Retrofit," and the "Remainder." The "Shuttle Unique" category included payloads which could not be launched using an expendable launch vehicle (ELV) but require a manned vehicle launch. The "National Security and Foreign Policy" category included those payloads which were designated as having national security or foreign policy implications. The third category referred to payloads which could be launched by an ELV, but with considerable additional expense. Three of Hughes' satellites fell into this category, while the other seven were included in the "Remainder" category.

Based on these categories and the President's revised policy, NASA announced a new manifest for its shuttle fleet. This manifest included only those payloads which fell into the "Shuttle Unique" and "National Security and Foreign Policy" categories. Ac-

---

**6.** Another document entitled "United States Space Policy" was issued on the same day and contained essentially the same provisions as President Reagan's policy statement.

cordingly, on October 30, 1986, NASA issued a letter to Hughes informing it that the new manifest did not include Hughes' spacecraft. The letter also stated:

It appears almost certain you will not be provided launch services either prior to or after your current contract expires. At the very least, it can be said with absolute certainty that your payloads will be delayed far in excess of the nine-month period described in Article VII, sub-paragraph 2.b. of Parts II and III of your Launch Services Agreement (LSA). Thus, should you wish to terminate your LSA prior to expiration, Article VII provides you may do so based on these delays. Upon termination, your payments to NASA will be refunded in accordance with the terms of the LSA.

Hughes filed suit in the United States Claims Court claiming that NASA breached the LSA and that Hughes' contract rights were taken in violation of the Fifth Amendment. On cross motions for summary judgment, the court granted the government's motion and held that Hughes could not recover under either of its claims.

With regard to the first claim, the Claims Court held that there was no breach of the LSA. Initially, the court determined that in spite of its "unusual features," the LSA was a binding contract because the government was obligated to use its best efforts to launch Hughes' spacecraft. 26 Cl.Ct. at 134. The court declined to determine whether or not the combined effect of the government's actions operated to invoke the contract's termination clause. *Id.* at 136. Instead, the Claims Court determined that the new manifest, and the exclusion of Hughes' spacecraft, were the result of a valid sovereign act—a policy decision issued by the President with proper authority. The court reasoned that Article XV of the contract incorporated the sovereign act defense by its terms and that the LSA was therefore explicitly made subject to changes in policy. *Id.* at 140. The Claims Court concluded that because the reorganization of the manifest was in compli-

ance with the new policy announced by the President, the government did not breach the LSA.

The Claims Court also determined that the Fifth Amendment did not provide any basis for compensating Hughes. Recognizing that Hughes must have an identifiable property interest in order to establish a Fifth Amendment taking, the court determined that Article XV's incorporation of all future policy changes precluded Hughes from establishing any "'distinct investment-backed expectation' that its slot on the Shuttle manifest would be unaffected by subsequent sovereign acts." *Id.* at 145. Hughes now appeals.

### *Discussion*

■■■ Contract interpretation is a matter of law which we review de novo. *Blake Constr. Co. v. United States,* 987 F.2d 743, 746 (Fed.Cir.1993). We hold that the Claims Court erred in its conclusion that Hughes' right to have its spacecraft launched under the LSA was subject to all policy changes issued after August 6, 1982.[7] Instead, Article IV of the LSA unambiguously required the government to schedule launch services according to "the United States policy governing launch assistance approved by the President of the United States on August 6, 1982." Art. IV ¶ 1.a.

We disagree with the conclusion that Article XV, and not Article IV, is the more specific provision of the contract. Article XV limits NASA's obligation to provide Launch and Associated Services "to the extent consistent with United States' obligations ..., United States' Law and United States' Published Policy." Article IV, on the other hand, states that NASA "will provide Launch and Associated Services in accordance with the United States policy governing launch assistance approved by the President of the United States on August 6, 1982."

By identifying and incorporating an existing, specific and dated item of presidential policy, Article IV is manifestly more specific than Article XV, which subordinates the con-

---

7. We agree with the Claims Court that best efforts contracts are routinely held valid. 26 Cl.Ct. at 133. In any event, the government did not challenge the validity of the contract before the Claims Court and does not do so here.

tract only to unspecified United States obligations, law and published policy. "Where specific and general terms in a contract are in conflict, those which relate to a particular matter control over the more general language." *Hills Materials Co. v. Rice*, 982 F.2d 514, 517 (Fed.Cir.1992). To the extent that Articles IV and XV are in conflict, Article IV's specific reference to the policy issued by the President on August 6, 1982, controls.[8]

■ This interpretation of the contract does not render Article XV redundant or superfluous. By its reference to all obligations, law and policy, Article XV has broader scope than Article IV, which only limits launch priority and scheduling to comply with the August 6, 1982, policy. There could be changes in the United States' obligations, laws or policy which are not superseded by Article IV's more narrow language and would still apply to the contract. A contract should be interpreted in such a way that all parts make sense. *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed.Cir.1983). Article IV's reference to the August 6, 1982, policy would be superfluous and meaningless if launch priority and scheduling remained subject to any subsequent change in policy.

■ We also believe the government's reiteration that Article XV embodies the sovereign act defense contributes nothing in aid of interpreting the contract. Under the sovereign act doctrine, the United States as contractor will not be held responsible for the acts of the United States as sovereign. *Atlas Corp. v. United States*, 895 F.2d 745, 754 (Fed.Cir.1990) (citing *Horowitz v. United States*, 267 U.S. 458, 461, 45 S.Ct. 344, 344, 69 L.Ed. 736 (1925)). The sovereign act defense is an inherent element of every contract to which the government is a party, whether or not explicitly stated.

■ Finally, we address the government's invocation of the principle that it retains the authority to act as sovereign unless it surrenders this right in "unmistakable terms." *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52, 106 S.Ct. 2390, 2397, 91 L.Ed.2d 35 (1986) (citing *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 147, 102 S.Ct. 894, 906, 71 L.Ed.2d 21 (1982)). Under our interpretation of the contract, we have no trouble concluding that Article IV obligates the government to provide launch priority and scheduling in accordance with the August 6, 1982, policy in language which more than satisfies the "unmistakable terms" requirement.

We do not share the concern that our reading of Article IV "would have the effect of allowing NASA to contract away Congressional and Presidential power to set space policy for the entire term of the LSA, twelve years." 26 Cl.Ct. at 139. In the cases relied on for this proposition, the plaintiffs sought literally to enjoin the exercise of sovereign power. It was in this context that the "unmistakable terms" standard was developed. *See Public Agencies*, 477 U.S. 41, 106 S.Ct. 2390 (The state of California and other parties sought to enjoin Congress from enforcing an amended provision of the Social Security Act of 1935, 42 U.S.C. § 301 *et seq.*); *Jicarilla Apache Tribe*, 455 U.S. 130, 102 S.Ct. 894 (Oil and gas companies who entered into long term leases to extract and produce oil and gas from tribal land sought to enjoin the tribe from acting as sovereign by imposing a severance tax on oil and gas removed from the land.); *see also Transohio Sav. Bank v. Director, OTS*, 967 F.2d 598 (D.C.Cir.1992) (Thrifts challenged Congress' authority to revise capital accounting rules issued by government agencies for thrifts with forbearance agreements.). These cases also required the reviewing court to determine whether Congress, by enacting the legislation which authorized the government to enter into the contracts in question, waived in "unmistakable terms" its right to exercise certain sovereign powers.

In contrast, the present case simply involves the question of how liability for certain contingencies was allocated by the contract. In its contractual capacity, the government executes countless agreements with private

---

8. Because we conclude that the contract shifts responsibility to the government for changes in policy which conflict with the provisions of Article IV, we offer no opinion about the presidential actions as they might pertain to the sovereign act doctrine.

entities to receive and provide services, goods and supplies. These contracts routinely include provisions shifting financial responsibility to the government for events which might occur in the future.[9] That some of these events may be triggered by sovereign government action does not render the relevant contractual provisions any less binding than those which contemplate third party acts, inclement weather and other *force majeure*. The policy approved by the President on August 6, 1982, remained controlling "[w]ith respect to launch priority and scheduling" as provided in Article IV. Our conclusion does not prevent the President or Congress from implementing space policy, but does require NASA, absent the successful assertion of another defense in this case, to bear the cost of changes in launch priority and scheduling resulting from the revised policy.

### Conclusion

Accordingly, the judgment of the Court of Federal Claims is reversed, and the case is remanded for further proceedings consistent with this opinion.

### COSTS

The government shall bear the costs of this appeal.

*REVERSED AND REMANDED.*

9. For instance, Federal Acquisition Regulation (FAR) 52.222–43 requires government entities entering into certain fixed price service contracts to include a price adjustment clause specifying that the government will compensate service contractors for increases in wages and fringe benefits resulting from compliance with Department of Labor wage and fringe benefits determi-nations. In *Hills Materials Co. v. Rice*, 982 F.2d 514 (Fed.Cir.1992), we held that pursuant to FAR 52.236–7, the Air Force contractually accepted financial responsibility for changes in certain OSHA regulations. "While [the contractor's] compliance with subsequent changes would not be excused, it could entail additional compensation." *Id.* at 516.