**HUGHES COMMUNICATIONS GALAXY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 91–1032C.**

United States Court of Federal Claims.

Nov. 30, 1995.

---

6. Plaintiff was given leave to file a sur-reply. It shed no relevant light.

Clarence T. Kipps, Jr., with whom were Alan C. Brown, Kevin C. Dwyer, and Heidi A. Sorensen, Washington, D.C., for plaintiff. John J. Higgins, John T. Kuelbs, Jennifer A. Smolker, Scott B. Tollefsen, and M. Keith Nocket, Los Angeles, California, of counsel.

Geoffrey C. Cook, with whom were Assistant Attorney General Frank W. Hunger, and David M. Cohen, Washington, D.C., for defendant. June W. Edwards, National Aeronautics and Space Administration, Washington, D.C., of counsel.

## OPINION

BRUGGINK, Judge.

This case is on remand from a decision of the United States Court of Appeals for the Federal Circuit reversing this court's decision in *Hughes Communications Galaxy,*

*Inc., v. United States,* 26 Cl.Ct. 123 (1992) (hereafter *"Hughes I"*). The Federal Circuit reversed this court's holding that the plaintiff could not recover damages under its contract with the National Aeronautics and Space Administration ("NASA") when NASA's failure to deploy Hughes' satellites was the result of the President's decision to stop launches of commercial satellites. *Hughes Communications Galaxy, Inc., v. United States,* 998 F.2d 953 (Fed.Cir.1993) (hereafter *"Hughes II"*). Both parties have filed motions for summary judgment. Plaintiff's is limited to liability. After carefully considering the parties' written and oral arguments, the court concludes that plaintiff's motion should be granted and defendant's motion should be denied.

## FACTUAL BACKGROUND [1]

In an attempt to help fund the fledgling Space Shuttle program, NASA embarked on a mission in the early 1980's to develop a satellite launching capacity using the Shuttle [2] as its launch vehicle. NASA created a "Division of Customer Relations" that printed color sales brochures and developed an advertising campaign centered around the slogan "We Deliver." Touting the reliability and safety of manned launches, NASA further lured commercial clients with a detailed "Space Transportation System Marketing Plan" that stressed the economic benefits of using the Shuttle. The Shuttle's pricing was attractive because NASA was the recipient of government funding.[3]

On August 6, 1982, President Reagan issued a "Space Assistance and Cooperation Policy," along with implementation guidelines for that policy, which stated:

With respect to the priority and scheduling for launching foreign payloads at U.S. launch sites, such launchings will be dealt with on the same basis as U.S. launchings.

Each launching will be treated in terms of its own requirements and as an individual case. Once a payload is scheduled for launch, the launching agency will use its best efforts to meet the scheduling commitments. Should events arise which require rescheduling, the U.S. will consult with all affected users in an attempt to meet the needs of the users in an equitable manner.

Also issued on August 6, 1982, was a document entitled "United States Space Policy," which contained a paragraph nearly identical to the one quoted above. The only difference was that the latter document deleted the first sentence of the paragraph and named "NASA" as "the launching agency" and the party that "will consult with all affected users" in the event rescheduling is required. Thus, each payload in this commercial/foreign class of payloads was to receive equal priority. It was against this policy framework that NASA contracted with commercial customers for the use of the Shuttle as a satellite launch vehicle.

From 1981 until 1986, the Space Shuttle fleet flew twenty-four successful missions, with launches coming as frequently as one per month. Ten of those missions carried commercial payloads; a total of twenty-four commercial satellites were deployed.

On December 5, 1985, Hughes Communication Galaxy, Inc. ("Hughes") and the United States, represented by NASA, executed Launch Services Agreement ("LSA") No. 1383–001, under which NASA was to use its "best efforts" to launch ten satellites owned by Hughes aboard the Space Shuttle. The ten satellites were Hughes 393 class spacecraft, designated HC–9 through HC–18. NASA's obligations under the LSA were to remain in effect until September 30, 1994, or until all ten satellites were launched, whichever came first.

---

1. The Government contested more than half of the plaintiff's current proposed findings of fact, and qualified its agreement with many others. The relevant background facts are relatively limited however, and are drawn from the court's earlier decision in *Hughes I,* to the extent findings there were uncontroverted, and from uncontroverted proposed findings of fact associated with the present motions.

2. The term "Shuttle" will be used throughout this opinion to denote the fleet of Shuttles.

3. In *Hughes I,* the court provides a complete history of NASA's entry into the arena of commercial payload launches and the development of United States policy in this area. 26 Cl.Ct. at 125–28.

Three of Hughes' payloads (HC–9, 10, and 11) were designated in the LSA as "Scheduled Launches," and had "Planned Launch Dates" between December 1987 and November 1988. LSA, Art. I, ¶ 1(a). Seven other payloads (HC–12 through 18), were designated in the LSA as "Standby Launches." *Id.* The agreement placed certain obligations on NASA to schedule and then launch both planned and standby launches within certain time constraints. *See* LSA, Part II, Art. IV, ¶ 1; Part III, Art. IV, ¶ 1.

On January 28, 1986, before any of Hughes' satellites could be launched, the Shuttle Challenger exploded shortly after take-off from the Kennedy Space Center at Cape Canaveral, Florida. As a result of the loss of the Challenger, the NASA Shuttle fleet was reduced from four Shuttles to three.

At the time of the Challenger accident, NASA had LSAs to launch forty-four other commercial payloads, including the ten Hughes satellites. These payloads were listed, along with the other payloads scheduled for launch, on a document called a manifest. The manifest showed what payloads were scheduled to be deployed on which orbiter and when that orbiter was scheduled to be launched. The commercial payloads were listed on the Shuttle manifest in order of their "Planned" or "Firm Launch Date."[4] As of the date of the Challenger accident, Hughes' satellites filled slots 12, 17, 22, 26–28, 30–31, 34 and 35 on the commercial payload listing.

On February 7, 1986, Robert Tucker of NASA issued a telegraphic message for "Distribution," presumably to the commercial users of the Shuttle. The message referred to the Challenger accident and sought to assure the "customers" that:

> Regarding launches, once resumed we will endeavor to provide flight assignments to our commercial and foreign customers as close to the previously planned launch dates as feasible. However, it must be recognized this may not be possible in all cases due to specific constraints such as launch windows and other considerations. In the interim we recommend you proceed on the basis that your flight assignment will be maintained until we notify you of any change which may be required.

By Executive Order No. 12,546 dated February 3, 1986, President Reagan established a Commission chaired by former Secretary of State William P. Rogers to investigate the Challenger accident. On June 6, 1986, the Rogers Commission, as it came to be known, issued its report. In it, the Commission criticized NASA's flexibility with regard to the rescheduling of commercial payloads. It suggested that the commercial responsibilities of the Shuttle were at least partially to blame for the Challenger accident.

In March 1986, reports appeared in the press that the White House Senior Interagency Group on Space ("SIG–Space")[5] was considering limiting access to the Shuttle to defense and scientific payloads. *See* Craig Covault, *Administration Formulates New Space Policy*, AVIATION WK. & SPACE TECH., Mar. 17, 1986, at 22; *NASA No–Launch Decision Put on Hold in Face of Congressional Opposition*, COMM. DAILY, Mar. 17, 1986, at 4; David E. Sanger, *NASA Would Shift Some Launchings to Private Sector*, N.Y. TIMES, Mar. 12, 1986, at A1. On August 15, 1986, after months of hearings, testimony,

---

4. The LSA defines "Planned Launch Date" as:

the date, which initially defines the beginning of the interval during which launch is to occur, agreed to by the parties at the time of execution of the Agreement, at the time the Customer exercises a launch option given in this Agreement or at the time a Payload launch is rescheduled to occur greater than one year thereafter.

Hughes Launch Services Agreement, Art. XX, ¶ 21.

"Firm Launch Date" is defined as:
the date established on or about one year before the Planned Launch Date or at the time a Payload launch is rescheduled to occur within one year after the date of rescheduling. The original Firm Launch Date defines the beginning of the reduced interval during which launch is to occur.
*Id.* ¶ 10.

5. SIG–Space was comprised of representatives from NASA, the Departments of Commerce, Defense, State and Transportation, the Joint Chiefs of Staff, the Central Intelligence Agency, and the Office of Management and Budget, and was chaired by the National Security Affairs Adviser, Admiral John Poindexter.

and debate on the future of the Shuttle program, the President issued the following statement:

> I am announcing today two steps that will ensure America's leadership in space exploration and utilization. First, the United States will, in FY 1987, start building a fourth space shuttle to take the place of the *Challenger*, which was destroyed on January 28th. This decision will bring our shuttle fleet up to strength and enable the United States to safely and energetically project a manned presence in space.
>
> Without the fourth orbiter, NASA's capabilities would be severely limited and long-term projects for development of space would have to be either postponed, or even canceled. A fourth orbiter will enable our shuttles to accomplish the mission for which they were originally intended and permit the United States to move forward with new, exciting endeavors like the building of a permanently manned space station.
>
> My second announcement concerns the fundamental direction of the space program. NASA and our shuttles will continue to lead the way, breaking new ground, pioneering new technology, and pushing back the frontiers. It has been determined, however, that NASA will no longer be in the business of launching private satellites.
>
> The private sector, with its ingenuity and cost effectiveness, will be playing an increasingly important role in the American space effort. Free enterprise corporations will become a highly competitive method of launching commercial satellites and doing those things which do not require a manned presence in space. These private firms are essential in clearing away the backlog that has built up during this time when our shuttles are being modified.
>
> We must always set our sights on tomorrow. NASA and our shuttles can't be committing their scarce resources to things which can be done better and cheaper by the private sector. Instead, NASA and the four shuttles should be dedicated to payloads important to national security and foreign policy, and, even more, on exploration, pioneering and developing new technologies and uses of space. NASA will keep America on the leading edge of change; the private sector will take over from there. Together, they will ensure that our country has a robust, balanced, and safe space program.
>
> It has been over 6 months since the tragic loss of the *Challenger* and her gallant crew. We have done everything humanly possible to discover the organizational and technical causes of the disaster and to correct the situation. The greatest tribute we can pay to those brave pathfinders who gave their lives on the *Challenger* is to move forward and rededicate ourselves to America's leadership in space.

Statement by the President, 22 WEEKLY COMP. PRES. DOC. 1103–04 (Aug. 15, 1986).

From Hughes' perspective, the operative part of this announcement is the President's directive that "NASA will no longer be in the business of launching private satellites." The President's announcement left the Government with the problem of what to do with the forty-four commercial payloads that were manifested as of the date of the Challenger accident. At a press conference also held on August 15, 1986, the President's press secretary, Larry Speakes, told reporters that a "working group" of the President's Economic Policy Council ("EPC") [6] would "set priorities among these forty-four" payloads and advise their owners as to when they might be launched. Press Briefing by Larry Speakes, et al., Aug. 15, 1986, at 2. Mr. Speakes would not be specific as to how the payloads would be prioritized, but he did suggest that

---

**6.** The Economic Policy Council was created by President Reagan in 1985 to advise him on "national and international economic policy." Statement on the Creation of two Cabinet–Level Bodies, 1985 Pub. Papers 437 (Apr. 11, 1985). The council consisted of the "Secretaries of State, Treasury, Agriculture, Commerce, and Labor, the Director of the Office of Management and Budget, the United States Trade Representative, and the Chairman of the Council of Economic Advisers." *Id.* Mr. Speakes said at the press conference, however, that NASA, the National Security Council, and the Department of Transportation were also represented in the "working group" of the EPC. *Press Briefing by Larry Speakes, et al.,* Aug. 15, 1986, at 2.

special consideration would be given to those payloads that required a manned presence for deployment and those that had national security or foreign policy implications. *Id.* at 3.

The President directed the EPC to formulate a plan to help him decide what to do with the forty-four remaining commercial payloads. At the President's direction, NASA and the EPC grouped the forty-four commercial payloads that were the subject of the outstanding LSAs into four classes. The list, entitled "Space Shuttle Contracts/Forty Four Commercial/Foreign Payloads," was broken down as follows:

I. Shuttle-unique

II. National security and foreign policy

III. Costly to retrofit

IV. Remainder

The first category, "Shuttle-unique," is a term of art which refers to payloads designed in such a way so as to require that they be launched using a manned vehicle, rather than by an unmanned expendable launch vehicle ("ELV"). Eight satellites fell into this category. The second category included seventeen payloads deemed by the Government to have national security or foreign policy implications.[7] Five of the seventeen in this category were also deemed "Shuttle-unique." The third category consisted of eleven payloads that were originally designed for Shuttle launch, but which could be retrofitted for launch aboard an ELV, albeit at a high cost. The thirteen remaining payloads fell into the fourth category.

The EPC provided the President with a plan for possibly shifting some of the forty-four commercial payloads from the Shuttle to the private sector. The plan offered three options from which the President could choose. Under the first option, only the first two categories of satellites (I. and II. above), consisting of twenty satellites, would be manifested on the Shuttle. Under the second option, the thirty-one payloads falling within the first three categories (I., II., and III. above) would be included on the new post-

Challenger manifest. The third option had all forty-four commercial payloads being scheduled for Shuttle launch. NASA, still hoping for a more economically self-sufficient Shuttle program, argued in favor of either the second or third options, so that at least it could launch thirty-one payloads, if not all forty-four. The Department of Transportation, on the other hand, favored the cancellation of all of the LSAs, in order to foster a more rapid development of a private ELV industry. The EPC decided to recommend the first option, manifesting only those commercial payloads that were shuttle-unique or had national security or foreign policy implications.

On September 25, 1986, Alfred H. Kingon, the President's Cabinet Secretary, sent a memorandum to NASA's Administrator, Dr. James C. Fletcher, announcing that the President adopted the EPC recommendation. None of Hughes' HC-series satellites qualified for national security, foreign policy, or shuttle-unique status. Three of the satellites were classified as "Costly to retrofit," and the remaining seven were classified in the group entitled "Remainder."

On October 3, 1986, NASA issued a telegraphic message addressed to the "Commercial and Foreign Customers" of the Shuttle. The message announced the new manifest for the Shuttle. The new manifest was comprised solely of those twenty payloads that met the criteria set forth in the President's order, and did not include any of the HC-series satellites. The telegraphic message stated: "Within the priority category foreign and commercial, the priority has been given to those payloads which are shuttle-unique and those which have national security and foreign policy considerations. These as a group, to the extent practicable have been manifested using the pre [Challenger] sequence as a guideline." The message offered several reasons why the new manifest was necessary. Among the reasons cited were: "the Rogers Commission and its associated recommendations; ... and the President's decision to proceed with a replacement orbi-

---

7. It is unclear from the record whether NASA, the EPC or some other group was responsible for determining which payloads had national securi-

ty or foreign policy implications. Hughes does not dispute that its satellites do not qualify for this category.

ter and to remove the space shuttle from the competition for launching private satellites."

By letter dated October 30, 1986, NASA formally informed Hughes that there were no launch dates on the current manifest for the HC-series payloads. The letter explained that the new manifest "reflects current White House policy and represents NASA's judgment on how best to satisfy launch requirements which far exceed current capacity." The letter went on to state:

It appears almost certain you will not be provided launch services either prior to or after your current contract expires. At the very least, it can be said with absolute certainty that your payloads will be delayed far in excess of the nine-month period described in Article VII, sub-paragraph 2.b. of Parts II and III of your Launch Services Agreement (LSA). Thus, should you wish to terminate your LSA prior to expiration, Article VII provides you may do so based on these delays. Upon termination, your payments to NASA will be refunded in accordance with the terms of the LSA.

In a letter dated January 7, 1987, Hughes notified NASA that it wanted "to terminate the HC–9 Scheduled Launch and obtain a refund of the HC progress payments made to date.... It is our understanding that ... the remaining 9 launches may for the time being remain on contract unaffected by the HC–9 termination." Hughes received a refund of approximately $5.8 million with respect to termination of the HC–9 launch. There is no evidence in the record that Hughes attempted to terminate any other scheduled launches.

Shuttle operations recommenced in 1988. In the succeeding years, the Shuttle has made several successful trips and dozens of payloads have been successfully launched. Defendant does not dispute that some of the launches had capacity to carry additional payloads. Hughes' satellites were never launched or included on any manifest, however. Hughes has subsequently made arrangements to launch its satellites using alternative means.

## PROCEDURAL HISTORY

Plaintiff filed suit in this court on March 22, 1991. Its complaint consists of two counts. Count I alleges that the Government breached the LSA, and count II alleges a Fifth Amendment taking of plaintiff's contract rights.

By an opinion of April 13, 1992, this court granted the Government's motion for summary judgment. *Hughes I*, 26 Cl.Ct. at 146. In rejecting plaintiff's contract claim, this court held that although the LSA was a binding contract, there was no breach by the Government because the President's change in space policy which led to the non-launch of plaintiff's satellites was a sovereign act. *Id.* at 134–42. The court reasoned that Article XV of the LSA incorporated the sovereign act defense by its terms and that the LSA was therefore explicitly made subject to changes in space policy. *Id.* at 140. The court concluded that because the reorganization of the manifest was in compliance with the new policy announced by the President, the Government did not breach the LSA. *Id.* at 144 ("[T]he decision to end commercial use of the Shuttle ... was a sovereign act. It prevented NASA ... from honoring its obligations under the LSA. This would have been the case even in the absence of Article XV, but due to the presence of that clause, there can be no question that the agreement was not breached.").

In rejecting the plaintiff's takings claim, this court held that plaintiff's positioning on the pre-Challenger manifest was not "property" within the meaning of the Fifth Amendment. *Id.* at 145. The court reasoned that Article XV's incorporation of all future policy changes precluded plaintiff from establishing any " 'distinct investment-backed expectations' that its slot on the Shuttle manifest would be unaffected by subsequent sovereign acts." *Id.*

On appeal, this court's decision was reversed and remanded by the United States Court of Appeals for the Federal Circuit. *Hughes II*, 998 F.2d at 959. In pertinent part, the Federal Circuit held:

We hold that the Claims Court erred in its conclusion that Hughes' right to have its space craft launched under the LSA was

subject to all policy changes issued after August 6, 1982. Instead, Article IV of the LSA unambiguously required the government to schedule launch services according to "the United States policy governing launch assistance approved by the President of the United States on August 6, 1982." Art. IV ¶ 1.a.

We disagree with the conclusion that Article XV, and not Article IV, is the more specific provision of the contract.

By identifying and incorporating an existing, specific and dated item of presidential policy, Article IV is manifestly more specific than Article XV. . . .

. . . Article IV's reference to the August 6, 1982, policy would be superfluous and meaningless if launch priority and scheduling remained subject to any subsequent change in policy.

. . . .

[T]he present case simply involves the question of how liability for certain contingencies was allocated by the contract. In its contractual capacity, the government executes countless agreements with private entities to receive and provide services, goods and supplies. These contracts routinely include provisions shifting financial responsibility to the government for events which might occur in the future. That some of these events may be triggered by sovereign government action does not render the relevant contractual provisions any less binding than those which contemplate third party acts. . . . The policy approved by the President on August 6, 1982, remained controlling "[w]ith respect to launch priority and scheduling" as provided in Article IV. Our conclusion does not prevent the President or Congress from implementing space policy, but does require NASA, absent the successful assertion of another defense in this case, to bear the cost of changes in launch priority and scheduling resulting from the revised policy.

*Id.* at 957–59.

On remand, Hughes has filed a Motion for Partial Summary Judgment as to Liability, relying only on Count I, in which it asks this court to find that the Government breached the LSA by failing to use its "best efforts" to provide Hughes with launch services, by refusing to schedule for launch, and to launch, its payloads within the time periods specified in the LSA, and by failing to prioritize and schedule Hughes' payloads in accordance with the 1982 policy. Hughes contends that the Government has no defenses to this breach. It requests that all future proceedings in this matter be limited to a determination of the amount of damages. Hughes alleges that as a result of the Government's failure to launch its satellites in accordance with the LSA, it has incurred damages in excess of $288,454,000.

Defendant has filed a Cross–Motion for Summary Judgment requesting this court to find for the Government on the questions of liability and to dismiss the complaint. The Government argues that it has not breached the LSA and that it is shielded from liability by certain contractual defenses, specifically the "best efforts" clause, the "termination" clause, and the "waiver" clause.

### DISCUSSION

■ This court is obligated to obey the mandate of the Federal Circuit. *See In re Roberts,* 846 F.2d 1360, 1363 (Fed.Cir.1988). Unless the Government is able to demonstrate the existence of a defense that was not considered and rejected by the Federal Circuit, under the law of the case doctrine, the Government is liable for damages incurred by Hughes as a result of the implementation of the 1986 Shuttle policy. *Hughes II,* 998 F.2d at 959. *See Bankers Trust Co. v. Bethlehem Steel Corp.,* 761 F.2d 943, 950 (3d Cir.1985) ("[t]he principles of law enunciated in the appellate opinion, . . . must be taken as the law of the case").

The Government contends that it has four defenses to this alleged liability: application of the "best efforts," termination, and waiver clauses of the LSA, and the asserted lack of conflict between the 1982 and 1986 policies. These same arguments were made in the companion case of *American Satellite Co. v. United States,* 34 Fed.Cl. 468, (1995) (hereafter *"ASC III"*). Each of those arguments was rejected in the opinion in that case,

issued contemporaneously herewith. *Id.* Although there are differences in the records developed in these two cases, the necessary facts are sufficiently similar that the analysis in *ASC III* is adopted here.

■ The first defense centers around the LSA's "best efforts" language. The introductory paragraph in Article I of the LSA states: "All Launch and Associated Services to be furnished by NASA to the Customer under this Agreement shall be so furnished by NASA using its best efforts." The Government argues that this sentence makes clear that NASA, not any other part of the Federal Government, is furnishing the launch services and that the services are subject only to *NASA's* best efforts, as opposed to those of the Government as a whole.

This argument cannot succeed. It was squarely rejected by the Federal Circuit in its reversal in this action, as well as the reversal in the companion case. *See American Satellite v. United States,* 998 F.2d 950 (Fed.Cir.1993) ("*ASC II* "). In *Hughes II,* the Federal Circuit clearly held that the Government had contractually agreed to accept financial responsibility for costs associated with a change in satellite launch and scheduling policy. The fact that it was not NASA who developed or chose this new policy was deemed irrelevant by the Federal Circuit. The court explained:

> [T]he present case simply involves the question of how liability for certain contingencies was allocated by the contract. In its contractual capacity, the government executes countless agreements with private entities to receive and provide services, goods and supplies. These contracts routinely include provisions shifting financial responsibility to the government for events which might occur in the future. That some of these events may be triggered by sovereign government action does not render the relevant contractual provisions any less binding than those which contemplate third party acts.... The policy approved by the President on August 6, 1982, remained controlling "[w]ith respect to launch priority and scheduling" as provided in Article IV. Our conclusion does not prevent the President

or Congress from implementing space policy, but does require NASA, absent the successful assertion of another defense in this case, to bear the cost of changes in launch priority and scheduling resulting from the revised policy.

*Hughes II,* 998 F.2d 953, 958–59. This court holds that NASA's exercise of its "best efforts" do not preclude liability when its inability to act was due to actions of the President. As we hold in *American Satellite,* the Federal Circuit's decisions do not permit the contract to be read in such a manner. *ASC III,* 34 Fed.Cl. at 475–76. The Government's adoption of a new policy that altered Hughes' rights under the LSA constituted an anticipatory breach of the LSA's requirement that NASA would exercise its best efforts to perform. Absent the assertion of a valid alternative defense, the United States is liable for any financial consequences of that breach.

■ The second defense raised by the Government is based on the assertion that the 1982 and 1986 Shuttle policies are not inconsistent. Therefore, when NASA determined that Hughes's satellites would not be launched pursuant to the 1986 policy, it did not breach Article IV of the LSA. "[B]ecause the 1986 policy directive did not conflict with the 1982 policy statement and because the President consistently retained the authority to establish launch categories and assign priority to such categories, NASA's compliance with the 1986 directive was consistent with the terms of the LSA." Def. Brief of March 21, 1995, at 19. The Government contends that President Reagan's prioritization of satellites in favor of those that were either Shuttle-unique or had national security/foreign policy implications applied equally to both foreign and domestic customers. Thus, the Government argues, when NASA adhered to the 1986 Shuttle policy and continued to treat foreign and domestic satellites on a nondiscriminatory basis, it acted consistently with, and not in breach of, the scheduling provisions of Article IV of the LSA.

■ The court notes initially that the Government has already conceded that the 1986 policy constituted a change. In its brief to

the court of appeals, the Government stated that

> The Challenger tragedy prompted then-President Reagan *to revise the August 1982 space shuttle policy.* To implement the President's revision, NASA altered its shuttle flight manifest to give priority among commercial payloads to those payloads that could be handled only on the shuttle, or had national security or foreign policy implications. . . .
>
> *As a result of the Presidential policy change,* in October 1986, NASA advised Hughes that it was "almost certain that NASA would not provide launch services to Hughes, either prior to or after your current contract expires."

Def. Brief of August 25, 1993, at 3 (emphasis supplied).[8] It made a similar concession in its initial motion to dismiss:

> As determined by the President, Hughes's satellites did not meet the *new space launch policy's priorities* for use of the space shuttle. In accordance with this directive, NASA properly advised Hughes that its satellites would not be launched prior to the LSA's expiration. . . .

Def. Brief of June 20, 1991, at 6 (emphasis supplied).

The best evidence that the President was actually making new policy and not merely tinkering within the nimbus of the 1982 policy is the impact of his directive on NASA's ability to accommodate Hughes' satellites. As the Government concedes in its current briefing, NASA's inability to furnish launch services was due to the President's September 25, 1986 order. Def. Brief of March 21, 1995, at 15. Hughes was told in October 1986 that it was almost certain none of Hughes' satellites would be launched. The ten satellites that had been given either planned launch dates or standby status on pre-Challenger manifests never appeared on subsequent manifests. As the court holds contemporaneously in *ASC III,* "the imposi-

tion of a new standard, particularly one that creates the possibility that some previously eligible payloads cannot be launched at all, constitutes a change in policy." *ASC III,* 34 Fed.Cl. at 476.

Moreover, the practical implications of the Government's position puts it at odds with the Federal Circuit's reversals in these two companion cases. The LSA incorporated a policy of treating domestic and foreign payloads equally. If the Government's current understanding of that contract provision and its incorporated policy were already implicit in the contract or policy, then it would have been unnecessary to announce a new policy. Instead, the Federal Circuit has held that the President's directive did in fact constitute a revision, and that the revision carried potential financial consequences, despite the fact that it may have resulted from a sovereign act of the President. *Hughes II,* 998 F.2d at 959. As explained in *ASC III:*

> [T]he real import of the Government's argument is that, imbedded, yet unarticulated, in the 1982 policy, is the possibility that the President can "establish launch categories and assign priority to such categories." Def. Brief of Mar. 23, 1995, at 19. This power must have a source either in the contract itself, or in the inherent powers of the President. The first possibility was squarely rejected by the Federal Circuit. As to the second, the court held that, while the contract could not bar the President from making changes in policy, neither it, nor the sovereign act doctrine, insulates the Government from the charge that such action constitutes a breach of the LSA.

*Id.* at 477.

■ The third defense is premised on Article VII of the LSA, which permits NASA to terminate the LSA based upon "a determination in writing that NASA is required to Terminate such services for Reasons Beyond

---

8. The Government's failure to accede to a proposed finding of fact predicated on this statement comes with an ill grace and is, in any event irrelevant. Counsel's statements in briefs can estop the client from subsequently taking a different position. *See Link v. Wabash R.R.,* 370 U.S. 626, 633–34, 82 S.Ct. 1386, 1390–91, *reh'g de-nied,* 371 U.S. 873, 83 S.Ct. 115, 9 L.Ed.2d 112 (1962); *Super Sack Mfg. Corp. v. Chase Packaging Corp.,* 57 F.3d 1054, 1059 (Fed.Cir.1995); *see also Purgess v. Sharrock,* 33 F.3d 134, 144 (2d Cir.1994); *City Nat. Bank v. United States,* 907 F.2d 536, 544 (5th Cir.1990).

NASA's Control." The phrase "Reasons Beyond NASA's Control" is defined in the LSA to include "acts of the United States Government other than NASA, in either its sovereign or contractual capacity." The Government concedes that NASA never formally invoked its rights under Article VII. Def. Brief of June 1, 1994, at 35. Moreover, there is evidence that NASA made an effort not to terminate the LSA's. In an undated document, but one obviously contemporaneous with the subject events, the agency stated that "NASA is not terminating customer contracts, [the] termination decision is [the] customers['] to make." As late as March, 1987, NASA was writing to other customers that the LSA's were still in existence, despite the October 1986 letter. While Hughes terminated the "Launch Services" for the HC–9 and asked for a refund of payments, there is no contention that it did so for other satellites.[9]

Nevertheless, the Government argues that the combination of the President's September 1986 directive to NASA and NASA's October 1986 communications to Hughes constituted a "de facto" termination of the LSA. According to the Government, the President's September 1986 directive was, as a practical matter, fatal to any chance at a launch for Hughes, and it thus constituted "an act of the United States Government other than NASA." The record simply does not permit, however, a finding that NASA invoked Article VII, paragraph 1(a)(iv).[10] That provision calls for a declaration in writing stating that NASA is required to terminate for reasons beyond its control. On the contrary, it is apparent that NASA was trying to avoid formally terminating.

■ More importantly, however, the court holds that the defendant's assertions with respect to Article VII are inconsistent with

the Federal Circuit's mandate. The appeals court held that the 1982 policy "remained controlling '[w]ith respect to launch priority and scheduling' as provided in Article IV." *Hughes II*, 998 F.2d at 959. As this court holds in *ASC III*:

> A fair reading of the two appellate decisions is that policy changes subsequent to the execution of the LSA cannot excuse the Government from its contractual obligation to perform in accordance with the 1982 policy. Yet the real import of the Government's present argument is that the very policy change which the Federal Circuit held could not constitute an excuse for non-performance is a "reason beyond NASA's control," hence justifying invocation of the termination clause. This court holds that it would be inconsistent with the mandate to find that the termination clause incorporated the possibility that policy changes in 1986 could absolve the Government of an obligation to attempt to perform according to the 1982 policy.

*ASC III*, 34 Fed.Cl. at 477–78. There is no reason that the result here should be different. The court adopts that analysis and rejects the Government's argument.

■ The final defense raised by the Government is that Hughes expressly waived any right it may have had to bring a nonperformance claim against the Government. In support of this argument, the Government relies on Article V of the LSA, which contains the contractual provisions dealing with the allocation of risk between the parties. Specifically, the Government cites Article V, paragraph 4 as the basis of its waiver defense. This paragraph states:

> Without affecting the right of the Customer to pursue the procedure under the Disputes provision set forth in Article XVIII

---

9. The letter of January 7, 1987, in which this termination was announced and a refund requested, came after NASA's announcement that the payload could not be "accommodated," and that it was almost certain none of Hughes' satellites would be launched before or after expiration of the contract period. The court draws no conclusions, for the present, as to what effects the letter of January 7 has on Hughes' ability to recover with respect to HC–9. It notes, however, that NASA took the position with at least one

other customer, Western Union Telegraph Co., that a request for refund could be made without waiving rights under the LSA.

10. The Government points out this court has previously adopted the view that the combined effect of the President's actions constituted a de facto termination. *Hughes I*, 26 Cl.Ct. at 136. The court did not rule on whether Article VII had been invoked, however, *Id.* at 135.

of this Agreement, the Customer shall not make any claim against the United States Government ... for Damage or other relief ... for the non-performance or improper performance of Launch and Associated Services....

Based upon this provision, the Government argues that Hughes unambiguously waived any right that it otherwise might have had to sue the Government for costs arising from NASA's failure to launch the payloads that were the subject of the LSA.

■■■ The Government made this same argument in its brief to the Federal Circuit on the appeal of *Hughes I. See* Appellee's Brief, No. 92–5137, at 38 (Fed.Cir. Nov. 13, 1992). The identical contention was made by the Government in response to the appeal of *American Satellite Co. v. United States,* 26 Cl.Ct. 146 (1992) (*ASC I* ). As we point out in today's ruling in that companion action, trial courts are permitted to assume that alternate grounds to sustain the results below are considered, if urged upon an appellate court. *Knotts v. United States,* 893 F.2d 758, 761 (5th Cir.1990). *See also J.E. Riley Inv. Co. v. Commissioner,* 311 U.S. 55, 61 S.Ct. 95, 85 L.Ed. 36 (1940). It is well-settled that if the decision below is correct, "it must be affirmed, although the lower court relied upon a wrong ground or gave a wrong reason." *Helvering v. Gowran,* 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed. 224 (1937), *reh'g denied,* 302 U.S. 781, 58 S.Ct. 478, 82 L.Ed. 603 (1938). *See also Wells Cargo, Inc. v. Wells Cargo, Inc.,* 606 F.2d 961, 964 n. 4, 203 U.S.P.Q. (BNA) 564, 567 n. 4 (C.C.P.A.1979) ("An appealed decision must be affirmed if it is sustainable on any ground supported by the record."). Consequently, "[i]f the Federal Circuit had accepted this defense, it would have been required to affirm this court's decision on other grounds and the reversal and remand would have been moot. It is fair to assume that this defense was rejected." *ASC III,* 34 Fed.Cl. at 480.

■■■ The court holds, moreover, for the reasons set out in *ASC III,* that the wording of the contract suggests that the waiver clause protects the Government against non-willful breaches of contract associated with the risk of operational failure. Reading Article V, paragraph 4 as permitting

the Government, without consequence, to willfully change its view about the wisdom of the undertaking, would be tantamount to declaring the contract void. *ASC III,* 34 Fed. Cl. at 479–80. In this respect, it is not necessary for the court to assign bad motives to the Government in order to make the decision not to launch "willful." Willful conduct is characterized by knowledge and intent, as opposed to accident. *Screws v. United States,* 325 U.S. 91, 101, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945); *United States v. Murdock,* 290 U.S. 389, 394, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933). The decision not to launch in this case was the result of deliberation, not negligence. Therefore, Article V, paragraph 4 does not afford the Government a defense under the present circumstances.

## CONCLUSION

For the reasons discussed above, plaintiff's Motion for Partial Summary Judgment as to Liability is granted and defendant's Motion for Summary Judgment is denied. The Government is liable to Hughes for breaching the LSA. The only remaining questions concern what impact the Government's breach of the LSA had on Hughes. On or before January 12, 1996, the parties are directed to file a joint status report indicating whether they are able to stipulate that Hughes incurred damages as a result of the Government's breach of the LSA, and if so, in what amount. If no such stipulation is possible, the parties are to submit a timetable for the briefing of the damages issues.