**PCA HEALTH PLANS OF TEXAS, INC., Appellant,**

**v.**

**Janice R. LaCHANCE, Director, Office of Personnel Management, Appellee.**

**No. 99–1052.**

United States Court of Appeals, Federal Circuit.

Decided Sept. 10, 1999.

Rehearing Denied Nov. 5, 1999.

**1354**

Arthur N. Lerner, Michaels, Wishner & Bonner, P.C., of Washington, DC, argued for appellant.

Franklin E. White, Jr., Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for appellee. With him on the brief were David W. Ogen, Acting Assistant Attorney General, David M. Cohen, Director, and Sharon Y. Eubanks, Deputy Director. Of counsel was Kathy M. Sachen–Gute, Deputy Assistant General Counsel, Office of Personnel Management, of Washington, DC.

Before MAYER, Chief Judge, LOURIE and RADER, Circuit Judges.

MAYER, Chief Judge.

PCA Health Plans of Texas, Inc. ("PCA") appeals the June 24, 1998 decision of the Armed Services Board of Contract Appeals, *PCA Health Plans of Texas, Inc.,* ASBCA No. 48711, 1998 WL 399678, affirming the Office of Personnel Management ("OPM") contracting officer's award of interest to OPM. Because the board properly denied PCA's appeal, we affirm.

*Background*

OPM contracted with PCA to provide health insurance to federal employees, ef-fective January 1, 1986. The contract stated that there was an automatic yearly renewal unless written notice is provided 60 days prior to January 1 of the contract year. Moreover, the contract incorporated all applicable provisions and regulations under the Federal Employees Health Benefits Act of 1959, 5 U.S.C. §§ 8901–8914 (1994 & West Supp.1999).

OPM's payments to PCA were based on "subscription charges," adjustments that reflect the "community rate" charged to PCA's entire membership for the same amount of benefits during the contract period. Effective January 1, 1988, the contract incorporated 48 C.F.R. ("FEHBAR") § 1652.215–70(c) (1988), under which a carrier that submits a defective community rate must pay the government the overcharge payment and interest "from the date the overcharge was paid by the Government to the Carrier." The contract also incorporated 48 C.F.R. ("FAR") § 52.232–17 (1988), providing that interest on overpayments is to be paid from the "date due."

In 1991, OPM modified the contract by updating the rate schedule to reflect current regulations, including an amended FAR 52.215–23 (1991), which expressly allowed for interest awards from the date of the government's overpayment. OPM notified PCA of this modification, and its January 1, 1991 effective date, in May 1991. The notification stated that its terms were "not negotiable." PCA signed the amended contract in June 1991.

Subsequently, an OPM Office of Inspector General audit found that PCA engaged, *inter alia,* in defective community rating and pricing for the contract years 1988, 1989, and 1991. OPM and PCA settled the penalties, except for $641,479 that the OPM contracting officer recommended in "lost investment income."

On appeal, the board granted OPM summary judgment for the payment of interest. Pertaining to contract years 1988 and 1989, the board held that FEHBAR 1652.215–70 expressly required payment of

interest from the date of the government overpayment. Moreover, contrary to PCA's claim, FAR 52.232–17 was not inconsistent with this interest provision. For the 1991 contract, the board held that PCA had provided defective pricing data, which required payment of interest from the date of overpayment pursuant to section 5.9 of the contract—i.e., FAR 52.215–23. The board then concluded that PCA had signed the modified contract, thereby agreeing to its January 1, 1991 effective date. Thus, the interest award was proper. PCA appeals.

### Discussion

 PCA challenges the board's interpretation of the regulatory provisions incorporated in its contract with OPM. "The Board's interpretation of a contract is not final, and is subject to *de novo* review on appeal, although due respect is often warranted by the Board's experience in interpreting the Federal Acquisition Regulations (FAR)." *Titan Corp. v. West,* 129 F.3d 1479, 1481 (Fed.Cir.1997). We interpret a regulation by first looking at its plain language. *See Lockheed Corp. v. Widnall,* 113 F.3d 1225, 1227 (Fed.Cir. 1997).

PCA concedes that FEHBAR 1652.215–70(c) (1988) requires it to pay "interest from the date the overcharge was paid by the Government to the Carrier until the date the overcharge is liquidated." It asserts, however, that this section conflicts with FAR 52.232–17 (1988), which states that "all amounts that become payable by the Contractor to the Government under this contract ... shall bear simple interest from the date due until paid.... Amounts shall be due at the earliest of the following dates: (1) The date fixed under this contract[; or] (2) The date of the first written demand for payment...."

PCA argues that, because it can occur only when the amount of overpayment is determined, the "date due" must be subsequent to the date the government made the overpayment. Therefore, the interest award should be decreased to reflect the proper "date due." In holding that the

"date due" may occur at the time of overpayment, the board relied on the interpretation of FAR 52.232–17 by FAR 32.614–1(a) (1988): a contracting officer "shall apply interest charges to any contract debt unpaid after 30 days from the issuance of a demand, unless—(1) The contract specifies another due date or procedure for charging or collecting interest...." This suggests that FAR 52.232–17 allows for an interest "procedure" like FEHBAR 1652.215–70.

 Both PCA and OPM provide reasonable interpretations of FAR 52.232–17's mandate that interest be paid from the "date due." "If terms are 'susceptible to more than one reasonable interpretation,' then they are ambiguous." *Massie v. United States,* 166 F.3d 1184, 1189 (Fed. Cir.1999) (quoting *McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1435 (Fed.Cir. 1996)). The ambiguity that arises from the possible interpretations of "date due"—the time of overpayment or when the amount of overpayment is determined—is so glaring as to make it patent. *See id.* PCA, however, did not "seek clarification from the government, and its failure to do so precludes acceptance of its interpretation." *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir.1996). Thus, we affirm the board's interpretation of FAR 52.232–17, requiring PCA to pay interest from the date of the overpayment.

 PCA also challenges the board's holding that it owes interest from the date of overpayment for contract year 1991. In December 1990, OPM amended section 5.9 of the contract, FAR 52.215–23 (1991), effective January 1, 1991. Under section 5.9(e)(1), "the Contractor shall be liable [for] ... [s]imple interest on the amount of such overpayment to be computed from the date(s) of overpayment to the Contractor." PCA asserts that it is not bound by this provision. We do not agree.

 Section 5.9(a)(2) states that "this clause does not apply to any modification for which the price is ... [b]ased on estab-

lished catalog or market prices of commercial items sold in substantial quantities to the general public." PCA contends that its community rated contracts were "market price" contracts that fall under this exception. OPM, however, announced in the Federal Register that FAR 52.215–23—section 5.9—would apply when a contractor "provid[es] defective cost or pricing data. . . . If the data on which the initial rate was converted is found defective, the clause provides a remedy for the Government." 52 Fed.Reg. 16036 (1987). PCA is charged with the knowledge of published regulations; it is therefore bound by OPM's interpretation of section 5.9. *See Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384–85, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *Montilla v. United States*, 198 Ct. Cl. 48, 457 F.2d 978, 985–86 (1972).

The board, crediting the OPM Office of Inspector General's audit of PCA, found that "OPM's claim ... does not concern rating 'methodology,' but furnishing to OPM of 'inaccurate data.'" We will not disturb the board's factual determination "unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or ... not supported by substantial evidence." 41 U.S.C. § 609(b) (1994). PCA presents no evidence that such a finding is warranted here. Thus, its submission of defective pricing data implicates the interest payment mandate of section 5.9(e)(1).

■ PCA argues that even OPM's construction of section 5.9 does not apply to the 1991 contract. Section 1.4 states that modifications like section 5.9 "will not be effective until the second contract year following the year in which the regulation or amendment is promulgated; unless ... [t]he Carrier agrees to an earlier date." At issue here is whether PCA agreed to the January 1, 1991 effective date.

PCA asserts that it is not bound by the modified regulation because OPM did not send notification until May 1991 and declared that the amendment was "not negotiable." However, PCA signed the amended contract, thereby agreeing to its effective date. That OPM was unwilling to negotiate the language of the modified provision is irrelevant. PCA could have refused to accept the new terms of the contract. Indeed, it does not appear that its 1991 plan would have been jeopardized had it done so; the contract is automatically renewed unless written notice is provided 60 days prior to January 1 of the contract year. *See* 48 C.F.R. § 1652.249–70(a) (1990). The board, therefore, was correct in holding that PCA agreed that the modified section 5.9 would be effective January 1, 1991, and OPM is entitled to interest pursuant to that clause.

### Conclusion

Accordingly, the decision of the Armed Services Board of Contract Appeals is affirmed.

*AFFIRMED*