**QUALMED PLANS FOR HEALTH OF NEW MEXICO, INC.,**
Plaintiff–Appellee,

v.

**UNITED STATES, Defendant–Appellant.**

No. 00–5108.

United States Court of Appeals, Federal Circuit.

Sept. 24, 2001.

Arthur N. Lerner, Crowell & Moring, LLP, of Washington, DC, argued for plaintiff-appellee.

Franklin E. White, Jr., Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were David M. Cohen, Director; and Mark A. Melnick, Assistant Director. Of counsel on the brief was Jill Gerstenfield, Attorney, Office of the General Counsel, Office of Personnel Management, of Washington, DC.

Before NEWMAN, MICHEL, and RADER, Circuit Judges.

RADER, Circuit Judge.

On summary judgment, the United States Court of Federal Claims denied the United States interest from the dates of its overpayment in 1991 and 1992 under a contract with Qualmed Plans for Health of New Mexico, Inc., (Qualmed). *Qualmed Plans for Health of New Mexico, Inc. v. United States*, No. 98–145C, slip op. at 11 (Fed.Cl. Jan. 11, 2000). In light of this court's opinion in *PCA Health Plans of Texas, Inc. v. LaChance*, 191 F.3d 1353 (Fed.Cir.1999), addressing similar contract provisions under similar circumstances, and this court's interpretation of Qualmed's contract, this court reverses.

I.

On January 1, 1986, Qualmed entered into a contract with the United States Office of Personnel Management (OPM) to provide health benefits to federal employees. Under that contract, Qualmed offered a comprehensive medical plan. The contract incorporated or restated regulations from the Federal Acquisition Regulations (FAR) and Federal Employees Health Benefit Acquisitions Regulations (FEHBAR). Those regulations governed Qualmed's pricing for its medical plan coverage and also any instance where Qualmed overcharged the Government.

For instance, section 3.3 of Qualmed's contract, which restates FEHBAR § 1652.215–70, entitled "Rate Reduction for Defective Pricing or Defective Cost or Pricing Data", states:

If any rate established in connection with this contract was increased because (1) the Carrier furnished cost or pricing data that were not complete, accurate, or current ... (2) the Carrier furnished pricing data that were not accurate as represented on the Claim for Exemption from Submission of Certified Cost or Pricing Data (SF 1412); (3) the Carrier developed FEHBP rates with a rating methodology and structure inconsistent with that used to develop rates for similarly sized subscriber groups [SSSG] ... or (4) the Carrier furnished data or information of any description that were not complete, accurate, and current— then the rate shall be reduced in the amount by which the price was increased because of the defective data or information.

Section 5.9, which restates FAR § 52.215–23 (1991), entitled "Price Reduction for Defective Cost or Pricing Data—Modifications," states:

(a) [T]his clause does not apply to any modification for which the price is . . .

(2) Based on established catalog or market prices of commercial items sold in substantial quantities to the general public.

(b) *If any price ... or any cost reimbursable under this contract, was increased by any significant amount because (1) the Contractor ... furnished cost or pricing data that were not complete, accurate, and current ...* the price or cost shall be reduced accordingly and the contract shall be modified to reflect the reduction.

\* \* \* \*

(e) *If any reduction in the contract price under this clause reduces the price of items* for which payment was made prior to the date of the modification reflecting the price reduction, *the Contractor shall be liable* and shall pay the United States at the time such overpayment is repaid—

(1) *Simple interest on the amount of such overpayment to be computed from the date(s) of overpayment* to the Contractor to the date the Government is repaid by the Contractor. . . .

(Emphasis added.)

Section 5.34, which restates FAR § 52.232–17 (1991), states:

(a) *[A]ll amounts, except amounts that are repayable and which bear interest under a Price Reduction for Defective Cost or Pricing Data clause [section 5.9],* that become payable by the Contractor to the Government under this contract ... *shall bear simple interest from the date due until paid unless paid within 30 days of becoming due . . . .*

(b) Amounts shall be due at the earliest of the following dates:

(1) The date fixed under this contract.

(2) The date of the first written demand. . . .

(3) The date the Government transmits ... a proposed supplemental agreement to confirm completed negotiations. . . .

(Emphasis added.)

In other words, section 5.9 of the contract permits the recovery of interest from the date of overpayment, 1991 and 1992 in this case. Section 5.34, on the other hand, only permits the recovery of interest from the date of first written demand for the amount, and only if the amount due is not paid within 30 days of that demand. Section 3.3 reduces the contract rates themselves by the amount the price increased because of defective data or information.

According to Qualmed, its plan calculated the charged rates based on a two-step process. First, the plan selected two "similarly sized subscriber groups" (SSSGs), which were converted from per member/per month capitation to separate "self" or "family" rates, i.e., to the "base rate." Second, the plan modified the base rate to account for variables between the Government and the SSSGs, including benefit levels (loading) and demographic information. After modification, this rate became the "subscription rate," or the rate charged to the Government.

OPM's Office of the Inspector General (OIG) performed an audit of Qualmed's operations for the years 1988–1992. In its Final Audit Report, the OIG found, *inter alia,* that the plan selected Public Service Company (PSC) and Honeywell as its SSSGs in 1991, and Intel and Honeywell as its SSSGs in 1992. The OIG determined

Qualmed did not accurately select SSSGs for 1991 and 1992. Specifically, Qualmed should have selected Los Alamos National Labs instead of Honeywell in 1991, and Los Alamos and PSC instead of Honeywell and Intel in 1992. Los Alamos and PSC were more accurate SSSGs in both 1991 and 1992 because those entities were arithmetically closer in size to the Federal Employees' Health Benefit Program (FEHBP). Because Qualmed incorrectly chose SSSGs, OPM determined that Qualmed overcharged for its medical coverage.

After the audit, Qualmed and OPM settled the dispute regarding reimbursements for the overpayment. Qualmed reimbursed to OPM the principal amount of overpayment within 30 days of reaching the settlement. The settlement, however, did not resolve the question of whether the Government was also entitled to recover interest from the date of overpayment, rather than from 30 days after the date of first written demand for the amount—the date of the settlement agreement. Thus, in February 1998, Qualmed filed a complaint in the Court of Federal Claims seeking a declaratory judgment that OPM was not entitled to interest on the overpayments. OPM filed a counterclaim seeking interest from Qualmed in the amount of $311,689,[1] as determined by the contracting officer, plus additional interest. Both parties filed motions for summary judgment. While those motions were pending, this court decided *PCA Health Plans of Texas, Inc. v. LaChance*, 191 F.3d 1353 (Fed.Cir.1999).

To the Court of Federal Claims, Qualmed argued that the two separate steps of calculating rates under the plan established a legal distinction between "defective community rating and defective pricing" and "defective cost or pricing data" under section 5.9. In other words, according to Qualmed, the selection of incorrect SSSGs amounted to "defective pricing"—an activity not covered by section 5.9. Qualmed observed that selection of SSSGs is part of the initial step of setting a base-line market price. Thus, Qualmed argued, "defective cost or pricing data" could not encompass the incorrect selection of SSSGs because "defective cost or pricing data" under section 5.9 was only possible during the second step of converting the base market price into the final rate through FEHBP-specific adjustments, i.e., only after the SSSGs had been selected.

Based on its interpretation of the 1987 Federal Register (52 Fed.Reg. 16032 (May 1, 1987)), the Court of Federal Claims accepted Qualmed's proffered distinction between "defective community rating and defective pricing" and "defective cost or pricing data." Specifically, the Court of Federal Claims noted that the Federal Register stated that FAR 52.215–23 (section 5.9) applied to loadings and demographic rate adjustments. The Federal Register did not expressly mention that the selection of SSSGs was also subject to this section. The Court of Federal Claims determined that "[t]his omission leads to the inference that selection of SSSGs are not included within the regulation." *Qualmed Plans*, No. 98–145C, slip op. at 8.

In addition, according to the Court of Federal Claims, both the Board of Contract Appeals (BCA) and the Federal Circuit holdings in *PCA Health Plans* implicitly accepted this distinction because those

---

1. $159,395 of this amount corresponds to interest charges for contract years 1988 and 1989. As noted in the Final Decision of OPM, dated April 7, 2000, Qualmed withdrew its claim that the 1988–89 contract did not provide for the recovery of interest from the date of overpayment.

opinions did not address this "underlying factual issue." Id. at 8–9. The Court of Federal Claims then determined that the overpayment in 1991 and 1992 was based solely on Qualmed's selection of the wrong SSSGs, which was not covered by section 5.9. Instead, the Court of Federal Claims concluded that that overpayment was covered by section 5.34. Because Qualmed reimbursed OPM's overpayment within 30 days of the Government's first written demand via the settlement agreement, the Court of Federal Claims concluded that the Government was not entitled to any interest under section 5.34 for the years 1991 and 1992. Consequently, the Court of Federal Claims granted Qualmed's motion for summary judgment. The Government appealed. This court has jurisdiction under 28 U.S.C. § 1295(a)(3) (1994).

## II.

■ The Federal Circuit reviews a grant of summary judgment by the Court of Federal Claims without deference. *Cook v. United States*, 86 F.3d 1095, 1097 (Fed.Cir.1996). Contract interpretation is also subject to review without deference. *Hughes Communications Galaxy, Inc. v. United States*, 998 F.2d 953, 957 (Fed.Cir. 1993).

■ In its summary judgment denying the Government interest for the overpayment under section 5.9 of the contract, the Court of Federal Claims declined to apply this court's decision in *PCA Health Plans*. The relevant facts in *PCA Health Plans*, however, are strikingly similar to this case. In *PCA Health Plans*, the OIG's audit report determined that PCA engaged in defective pricing because PCA incorrectly picked Abbott Labs and Motorola, rather than Travis County and the University of Texas, as SSSGs in 1991. *Appeal of PCA Health Plans of Texas, Inc.*, No. 48,711, slip op. at 10, 19 (A.S.B.C.A. June 24, 1998)

(*Appeal of PCA Health Plans*). PCA argued that OPM's 1991 claim concerned "rating methodology" rather than "defective cost or pricing data."

In its initial decision, the BCA found that PCA could not escape the application of section 5.9(e) based on its argument that OPM's claim concerned bad "methodology," not "defective pricing." *Id.* at 23. Because PCA identified two significantly underrated groups as its SSSGs, the Board found that OPM's claim concerned the furnishing of "inaccurate data." On appeal, this court affirmed, stating:

> The board, crediting the OPM Office of Inspector General's audit of PCA, found that "OPM's claim ... does not concern rating 'methodology,' but furnishing to OPM of 'inaccurate data.' " We will not disturb the board's factual determination "unless the decision is fraudulent, or arbitrary, or capricious...." PCA presents no evidence that such a finding is warranted here. Thus, its submission of defective pricing data implicates the interest payment mandate of section 5.9(e)(1).

*PCA Health Plans*, 191 F.3d at 1356. This court therefore affirmed the Board's grant of summary judgment that PCA owed interest from the date of the overpayment.

In response to the above-quoted language, Qualmed asserts that this court simply affirmed a "factual determination" in *PCA Health Plans*. Thus, according to Qualmed, that factual aspect of the prior case does not bind this case. As mentioned previously, however, the relevant facts in *PCA Health Plans* are nearly identical to those in this case. Namely, both PCA and Qualmed incorrectly picked underrated SSSGs, thereby causing them to overcharge for their medical coverage plan. In this case, the OIG clearly stated that Qualmed picked an incorrect SSSG in 1991, and two incorrect SSSGs in 1992,

even if it did pick one correct SSSG in 1991. As in *PCA Health Plans,* Qualmed's selection of incorrect SSSGs caused the overpayment. Moreover, Qualmed now relies on a "rating methodology" versus "defective cost or pricing data" argument—the same argument rejected by this court in *PCA Health Plans.*

Qualmed nonetheless presses its contention that only sections 3.3 and 5.34 provide a remedy for defects in the first step of the rating process, including use of inconsistent rating methodologies to establish market price. Section 5.9, according to Qualmed, does not apply to these first-step defects. Qualmed points out that section 5.9 is entitled "Price Reduction for *Defective Cost* or *Pricing Data*—Modifications," while section 3.3 is entitled "Rate Reduction for *Defective Pricing* or *Defective Cost* or *Pricing Data*" (emphasis added). Qualmed also notes that section 3.3 refers to "(3) the Carrier developed FEHBP rates with a rating methodology and structure inconsistent with that used to develop rates for similarly sized subscriber groups [SSSG]." Thus, according to Qualmed, only section 3.3 addresses "defective pricing" or the use of inconsistent rating methodologies, and the resulting failure to afford OPM the market price.

Sections 3.3 and 5.9, read in their entirety, however, do not contain the distinction urged by Qualmed. Section 3.3 states that if rates are calculated too high, "*the rate shall be reduced* in the amount by which the price was increased because of the defective data or information." In other words, section 3.3 does not address payment of interest, but instead requires reductions in inflated rates. Moreover, Qualmed's mistake—the selection of incorrect SSSGs—also fits with other provisions of section 3.3, namely, "(1) . . . cost or pricing data that were not complete, accurate, or current" or "(4) . . . data or infor-

mation of any description that were not complete, accurate, and current." This language is similar to section 5.9(b), which discusses "cost or pricing data that were not complete, accurate, and current." Thus, the contract remedies incomplete or inaccurate pricing data under both section 3.3 and section 5.9. Section 3.3 remedies this problem by requiring a reduction in rates to correct the inaccuracies. Section 5.9 further remedies the same problem by permitting the Government to recover interest on any overpayments.

The purported distinction in the 1987 Federal Register between "defective pricing" (as found by the OIG) and "defective cost or pricing data" under section 5.9 does not alter this reading of the contract. The 1987 Federal Register entry may not expressly state that the selection of SSSGs is subject to section 5.9, but the Register entry also does not expressly exclude overpayments based on an incorrect selection of SSSGs from coverage under section 5.9. In other words, the Federal Register does not resolve the question of applicability of section 5.9 to this case. *PCA Health Plans,* on the other hand, necessarily decided that section 5.9 applies to overpayments based on incorrect selection of SSSGs. Particularly because this court implicitly decided the issue in *PCA Health Plans,* this court detects no legal distinction between "defective pricing" and "defective cost or pricing data" for applying section 5.9.

### III.

In *PCA Health Plans,* PCA argued that its 1991 modifications were "based on established catalog or market prices of commercial items sold in substantial quantities to the general public," and therefore, section 5.9 did not apply to those modifications. *Appeal of PCA Health Plans,* slip

op. at 20. This court squarely addressed this issue:

> PCA contends that its community rated contracts were "market price" contracts that fall under this exception. OPM, however, announced in the Federal Register that FAR 52.215–23—section 5.9—would apply when a contractor "provid[es] defective cost or pricing data.... If the data on which the initial rate was converted is found defective, the clause provides a remedy for the Government." 52 Fed.Reg. 16036 (1987). PCA is charged with the knowledge of published regulations; it is therefore bound by OPM's interpretations of section 5.9.

*PCA Health Plans,* 191 F.3d at 1356.

Likewise, Qualmed argues that the annual establishment of the FEHBP market price based on SSSGs is a price modification "based on ... market prices of commercial items sold in substantial quantities to the general public." As discussed in *PCA Health Plans,* insurance companies, including Qualmed, received notice in the Federal Register that section 5.9 would apply to defective cost or pricing data. For the reasons discussed above, Qualmed provided "defective cost or pricing data" that was "not complete, accurate, and current" when it selected incorrect SSSGs, and then used that inaccurate data in calculating its rate. Thus, section 5.9 applies to this case. The contracting officer correctly determined that Qualmed must pay interest from the date of overpayment in 1991 and 1992.

### CONCLUSION

Based on *PCA Health Plans* and the language in Qualmed's contract, this court concludes that section 5.9 applies to overpayments made by the Government to Qualmed for its medical plan coverage based on Qualmed's incorrect selection of SSSGs. Thus, Qualmed must pay simple interest on the Government's overpayment, computed from the dates of overpayment in 1991 and 1992. Accordingly, this court reverses the summary judgment of the Court of Federal Claims.

### COSTS

Each party shall bear its own costs.

*REVERSED.*